**STATE of Maine**

**v.**

**Anthony Dale FISCHER.**

Supreme Judicial Court of Maine.

March 1, 1979.

Joseph M. Jabar, Dist. Atty., David W. Crook, Deputy Dist. Atty., Skowhegan, for plaintiff.

James E. Mitchell (orally), Augusta, Mark S. Kierstead, Waterville, for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY and GODFREY, JJ.

WERNICK, Justice.

Indicted on December 7, 1977 for having committed, on September 1, 1977, a violation of 17–A M.R.S.A. § 210[1] prohibiting Terrorizing, defendant Anthony Dale Fischer was tried before a jury in the Superior Court (Somerset County) on March 7–9, 1978. At the close of all the evidence defendant moved for a judgment of acquittal. The motion was denied, the case was submitted to the jury and the jury returned a verdict finding defendant guilty. After verdict, he moved for a new trial pursuant to Rule 33 M.R.Crim.P., which was denied. Defendant's appeal from the judgment of conviction entered on the verdict posits for our review his claims that the presiding Justice erred in denying the motion for judgment of acquittal and the post verdict motion for a new trial.

We deny the appeal.

### 1. The Motion for Judgment of Acquittal.

The motion for judgment of acquittal raises the question of the sufficiency of the evidence, taken most favorably to the State, to support the conviction. On the evidence the following jury findings of fact were justified. In the early afternoon of September 1, 1977 an anonymous telephone call, the voice being that of a male person, was received by William J. O'Donnell at Radio Station WSKW in Skowhegan, Maine. O'Donnell was a disc jockey and part-time news announcer at the station. The call came on the station's "request" line, and the caller stated the message, as O'Donnell described it in his testimony,

> "that there was a simulated bomb in the Courthouse, and that unless all the prisoners of the Somerset County Jail were released, that a real bomb would go off."

The message was stated twice within a period of approximately thirty seconds. O'Donnell immediately left his post at the "request" line in the station's studio and went to the radio station's office. There, he told his colleagues, most of whom were present on their lunch break, that he had just received a "bomb threat." He told them to call the State Police. Michael Hartung, the station's news director, left the office and from the telephone in the station's newsroom called the County Sheriff, William Wright.

---

1. The Terrorizing statute, as here pertinent, provided:

"*1.* A person is guilty of terrorizing if he communicates to any person a threat to commit or cause to be committed a crime of violence dangerous to human life, against the person threatened or another, and the natural and probable consequence of such a threat, whether or not such consequence in fact occurs, is:

"*A.* To place the person to whom the threat is communicated in reasonable fear that the crime will be committed; or

"*B.* To cause evacuation of a building, place of assembly or facility of public transport.

"*2.* Terrorizing is a Class C crime."

It had happened that shortly before he was called by Michael Hartung, the Sheriff had been handed a paper bag in which was a shoe box containing a battery wired to some wooden sticks. A janitor had found these items, in the form of a package, on a stairway inside the Courthouse. He had brought them to the office of Cynthia A. Pomerleau, the Clerk to the County Commissioners, and she in turn had taken them to the Sheriff's office.

Approximately at the time he received Hartung's phone call, the Sheriff was arranging for a secret search of the County Courthouse, the plan being to tell only department heads that a search was under way and to advise them that there was no cause for alarm; no mention was to be made to anyone that the search was for a bomb.

■ Defendant argues that the evidence was insufficient to prove beyond a reasonable doubt that defendant made, or was responsible for the making of, the telephone call to Mr. O'Donnell. The only evidence of defendant's connection to the telephone call was that investigation of the package delivered to the Sheriff revealed one fingerprint on the paper bag and two fingerprints on the shoe box, each of these prints being defendant's.

The State argues that the aggregate of the circumstances—that the fingerprints of defendant were on the package at the Courthouse which contained the false bomb and that the person telephoning O'Donnell knew of the existence of that false bomb and its location—establishes a sufficient common link between the placing of the bomb and the making of the telephone call to justify a conclusion that defendant was implicated in both the placing of the false bomb and the making of the telephone call.

Defendant disputes the State's argument, contending that even if the State's reasoning might be adequate to identify the person responsible for the telephone call as more probably than not the defendant, it cannot be sufficient to establish such identification beyond a reasonable doubt.

■ We disagree. True, as defendant points out, various steps in the circumstantial reasoning to identify the caller may involve doubts. For example, even though the fingerprints establish that defendant had handled the paper bag and shoe box containing the false bomb, another person might have taken possession of the bag and shoe box without (or even with) defendant's knowledge, and such other person without defendant's knowledge might have made the package for the false bomb and then placed it in the Courthouse. Another source of doubt could be that the person making the telephone call might have been either such other person (than defendant) who might have placed the false bomb, or someone totally unconnected with the planting of the false bomb who might by chance have heard about it and then acted entirely on his own to make the threatening phone call. If, at some point in its deliberations, the jury may have entertained such doubts that defendant was the person who made, or was responsible for, the telephone call, the jury did not act irrationally in arriving at an ultimate conclusion, as shown by the verdict, that in all the circumstances such doubts were fanciful, rather than realistic, and therefore were *not reasonable* doubts. As this Court said in *State v. Silva*, 153 Me. 89, 102, 134 A.2d 628, 634 (1957):

"The jury is not compelled, in its determination as to whether or not a reasonable doubt exists, to disregard all the probabilities and substitute therefor mere unlikely possibilities."

The evidence was sufficient to justify a jury determination that there were no *reasonable* doubts that defendant was responsible for the telephone call to Mr. O'Donnell.

■ Addressing the essential element of the crime described in 17–A M.R.S.A. § 210 by the language "communicates . . . a threat", defendant maintains that the telephone message to O'Donnell cannot be held to be a "threat", as a basis to impose criminal liability, consistently with the constitutional guarantee of freedom of speech. Relying on *State v. Sondergaard*, Me., 316

A.2d 367 (1974) defendant argues that the constitutional infirmity, here, is that no "special relationship" was shown to exist between O'Donnell and any person in the Courthouse who might be injured were a bomb to explode.

Defendant misconstrues the "special relationship" analysis in *Sondergaard*. *Sondergaard* recognized that the constitutional guarantee of free speech requires that a communication which is sought to be subjected to criminal sanction under the characterization of being a "threat" must generate the reasonable likelihood that it will give rise in some person to "alarm" or "fear . . . to his disquiet." *Id.* at 369; see also *State v. Porter*, Me., 384 A.2d 429, 433 (1978). *Sondergaard* applied that insight to a particular context in which nothing else was shown than that A received a communication containing a "promise of evil" to *some one other* person, B. Regarding *that particular situation, Sondergaard* held that without at least a showing of some circumstances of "special relationship" between A and B, it could not be reasonable to expect the communication to give rise to "alarm" in A or "fear . . . to his disquiet"; so far as A was concerned, B could have been anyone in the world, and

> "the realities of day-to-day living do not justify the imposition of criminal penalties on a basis which attributes a universal empathy of one human being for the potential plight of any or every other human being." (316 A.2d 367, 370)

*Sondergaard*, therefore, did not pronounce, as defendant asserts, that *in each and every situation* where a communication states "a promise of evil" to a person other than the recipient of the communication, the communication may not constitutionally be regarded as a "threat", subject to criminal sanctions, unless a "special relationship" exists between the person receiving the communication and the person against whom the menace of evil is levelled. As to the situation now before us, where the communication involves a bomb menace to the Courthouse, *Sondergaard* would require, to characterize the communication a genuine threat, only that the

"circumstances . . . indicate the existence of a reasonable likelihood that . . . [the recipient of the communication] will be caused 'alarm' or 'fear . . . to his disquiet.'"

*State v. Porter, supra,* reiterated this point in particular relation to the Terrorizing statute here involved, which was enacted after the decision in *Sondergaard.*

The additional circumstances shown, here, that would be likely to induce alarm or fear in the recipient of the communication are: (1) the communication was made to a radio disc jockey and part-time news announcer over his "request" telephone line at the radio station; (2) the menace of evil contained in the communication was to the Courthouse, a building where many persons will be transacting business, some of them public officials performing important public duties. Since these circumstances show danger to persons engaged in the performance of the public's business, it is reasonably likely that a responsible disc jockey and news announcer, whose job it is to hold himself out before the public as interested in matters of public concern and as sensitive and responsive to their impact on the public welfare, will become "alarmed" or experience "fear . . . to his disquiet." Further evidence that this consequence was reasonably to be expected is what actually happened in the present instance. Upon receiving the communication, O'Donnell forthwith left his post, and describing the communication he had received as a "bomb threat", told others to call the State Police. A jury could fairly regard such conduct as O'Donnell's manifestation of his alarm and disquieting anxiety.

Thus, consistently with the constitutional guarantee of freedom of speech, the communication to O'Donnell may be held to be a genuine threat properly subject to criminal sanctions.

◼ Defendant argues, alternatively, that even if it may be constitutional to treat the telephone message to O'Donnell as, legitimately, a threat, the evidence was not sufficient to establish the crime of Ter-

rorizing defined in 17–A M.R.S.A. § 210. The contention is that the evidence was inadequate to show that the "natural and probable consequence" of the communication would be that either (1) O'Donnell, as the recipient of the communication, would be "place[d] . . . in reasonable fear" that the threatened crime of violence dangerous to human life[2] "will be committed" (Section 210.1.A), or (2) there would be "evacuation of a building, place of assembly or facility of public transport." (Section 210.1.B)

We reject the contention. We find the evidence adequate to support a jury conclusion based on either (or both) of the alternative consequences stated in Section 210.

In our prior discussion, directed to showing that the instant communication was a "threat" that may constitutionally be made an element of criminal liability, we explained that the communication could be found to engender reasonable likelihood— the "natural and probable consequence"— that the recipient of it would become alarmed. The alarm could reasonably be expected to result precisely because the recipient could be expected to have "reasonable fear" that an urgent likelihood had arisen that a real bomb will explode at the Courthouse, to-wit, the threatened crime of violence dangerous to human life will become a reality. The jury would be justified in finding that what O'Donnell did in reaction to the telephone call was a manifestation of his own actual fear of a bomb explosion at the County Courthouse.

The evidence was sufficient to support a jury verdict based on the alternative described in Section 210.1.A.

We also find warrant in the evidence for a jury verdict based on the Section 210.1.B

alternative, that the "natural and probable consequence" of the threatening communication to O'Donnell was "to cause evacuation of a building, place of assembly or facility of public transport." In this regard, it is important to keep in mind the evidence that a short time before the threatening telephone call was received by O'Donnell, a simulated bomb had been found at the County Courthouse. The telephone call made from the radio station to the County Sheriff, informing him of the "bomb threat" conveyed to O'Donnell, was received by the Sheriff within minutes of his having learned that a simulated bomb, which had been turned over to him, had been found at the Courthouse. Having already started to arrange for a search of the Courthouse to look for a real bomb, the Sheriff went through with that search after he had been told the substance of the telephone call to O'Donnell.

From these circumstances a jury could make a rational finding that the simulated bomb had been so placed in the Courthouse as to be easily found, and the call to disc jockey O'Donnell had been timed so that the message about the simulated bomb would be conveyed to the public authorities when it was likely that the simulated bomb had already been found, or soon would be found. The jury could then further infer that by placing the simulated bomb at the Courthouse and mentioning it in the telephone call to O'Donnell, the perpetrator (or perpetrators), if not actually intending the consequence, at least set in motion a train of circumstances that made the consequence natural and probable that greater credibility would attach to the other part of the message, that "a real bomb would go off."

---

**2.** Were a threat made stating that a "real bomb will go off in the Courthouse", plainly such threat would be to commit a crime of violence dangerous to human life. While it is true that, here, the threat did not make explicit reference to the Courthouse as the place where the real bomb would go off, it was open to the jury to find that this was the meaning of the threat. The reference to the false bomb as being in the Courthouse in direct conjunction with the statement that a real bomb "will go off" per-

mits as a reasonable inference that the real bomb will go off where the false bomb was, namely, at the Courthouse.

Moreover, the threat that a real bomb will go off at the Courthouse is no less real as a threat to commit a crime of violence dangerous to human life because it is made subject to a condition, more particularly where the condition is, as here, one that most likely will not be met.

This enhanced credibility in the statement about a real bomb would likely induce responsible public officials to be sufficiently concerned about the presence of a real bomb at the Courthouse to make a search for it.

Once the jury had warrant to find that it was natural and probable that the Courthouse would be searched for a real bomb, the jury was also justified in finding it "natural and probable" that the Courthouse would be evacuated. The higher credibility conferred on the message that a real bomb "would go off", by the corroboration of the information about the placing of the false bomb, could reasonably be expected to lead to a reaction of anxiety and urgency. It would be reasonable for responsible public officials to entertain the thought that even if, to allow some time for the authorities to consider whether to release the prisoners from the County Jail, the bomb may have been set, or otherwise contrived, to explode on a delayed basis, the risks of a premature explosion resulting from accident, mistake or other miscalculation could not be discounted. Such a reasonably expectable reaction on the part of the public officials could induce them to order the Courthouse evacuated, as an additional safety precaution, while a search for the real bomb was conducted. That the Sheriff here happened to decide against such a safety precaution does not render irrational a finding by the jury that in the instant circumstances it was natural and probable that the Courthouse would be ordered evacuated.

The evidence was sufficient to support the verdict of the jury, whether based on a finding of one or the other, or of both, of the alternatives set forth in Section 210.1.A and Section 210.1.B.

**2. The Motion for a New Trial.**

Defendant's motion for a new trial raises the additional question whether the presiding Justice erred in denying defendant's request for a jury verdict that would disclose, separately, the jury's findings in regard to each of the alternatives set forth in Section 210.1.A and B. The apparent purpose of defendant's request was to expose the precise ground of decision and thus clearly isolate it for purposes of appeal.[3]

Since we have decided that the evidence was sufficient to support a jury verdict on either, or both, of the alternatives in Section 210, the issue defendant seeks to raise has become academic and need not be addressed.[4]

The entry is:

Appeal denied; judgment of conviction affirmed.

NICHOLS, J., did not sit.

**3.** It could not have been defendant's purpose to seek separate findings to provide the Superior Court with a proper foundation for sentencing. As of September 1, 1977 when the crime charged was committed, a violation of 17–A M.R.S.A. § 210 was a Class C crime, without differentiation in penalty depending on whether Section 210.1.A or Section 210.1.B was violated. The present provision, which retains the violation of Section 210.1.B as a Class C. crime but makes violation of Section 210.1.A a Class D crime, became effective October 24, 1977.

**4.** We may note that in *State v. Heald*, Me., 307 A.2d 188, 192 (1973) we stated that where punishment considerations are not involved, "the use of special findings in criminal cases is not compatible with our traditional practice."