### STATE of Maine

v.

### JOHN W.

Supreme Judicial Court of Maine.

Argued April 28, 1980.

Decided Aug. 25, 1980.

1098

G. Arthur Brennan, Dist. Atty., Joseph A. Wannemacher (orally), Asst. Dist. Atty., Alfred, for plaintiff.

Zbigniew J. Kurlanski, Portland (orally), for defendant.

Before McKUSICK, C. J., and WER-NICK, GODFREY, NICHOLS, GLASS-MAN and ROBERTS, JJ.

ROBERTS, Justice.

John W. was adjudged to have committed the juvenile crime of Disorderly Conduct, 17–A M.R.S.A. § 501(2), arising out of his verbal abuse of a police officer. On appeal to the Superior Court under 15 M.R.S.A. §§ 3401–3405, the adjudication and disposi-tion were affirmed. John W. filed a timely appeal to the Law Court under 15 M.R.S.A. § 3407. We reverse the judgment of the Superior Court and remand for entry of an order of dismissal pursuant to 15 M.R.S.A. § 3310(4).

John W.'s appeal attacks the sufficiency of the juvenile petition, challenges the suf-ficiency of the evidence and complains of the denial of a dispositional hearing. We find the petition barely sufficient. We agree that the sentencing procedure was deficient and, in fact, the sentence imposed was unlawful. More significantly, we hold that the evidence of verbal abuse of a police officer was insufficient to support the court's adjudication of guilt beyond a rea-sonable doubt. 15 M.R.S.A. § 3310(5)(A); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

### I. Sufficiency of the Petition

■ Prior to hearing in the juvenile court, John W. moved to dismiss the peti-tion and the state moved to amend. The amendment did not allege any additional or different offense. The court denied the motion to dismiss and, over the objection of the juvenile, granted the motion to amend. No objection was addressed specifically to the absence of an oath as to the amend-ment.[1] Since the record does not disclose a "substantial surprise or prejudice" requir-ing a continuance under Section 3310(2)(B)(2), we find no abuse of discre-tion. The petition, as amended, was mini-mally sufficient under the standards of *State v. Creamer*, Me., 379 A.2d 996 (1977), although the conduct proven did not exactly conform thereto.

### II. Denial of Dispositional Hearing

■ Our interest in the rights of juve-nile offenders compels us to point out that the disposition in this case violated the ju-venile's rights in two respects. 15 M.R.S.A. § 3312(1) requires that the juvenile court "after making an order of adjudication

---

1. 15 M.R.S.A. § 3302, by reference to the form and content of a complaint under D.C.R. Crim.P. 3, requires the original petition to be sworn to by the complainant. In view of the flexibility concerning amendments provided in Section 3310(2)(B), we find no reason to infer a requirement that amendments to juvenile peti-tions be sworn to.

. . . hear evidence on the question of the proper disposition best serving the interests of the juvenile and the public." While it is true that the preparation of a social study and written report on the juvenile adjudicated may be waived by the court, it is mandatory that the court conduct a dispositional hearing. Such a hearing need not be delayed beyond the day of adjudication nor need it necessarily be very extensive. At least one indispensable element of such a hearing is the right of the juvenile to be heard concerning the proper disposition. In this instance the court immediately imposed sentence after adjudication and when requested by defense counsel to hold a dispositional hearing, merely repeated the prior order of disposition. In addition, the 24–hour sentence to the county jail does not conform to the requirements of the Juvenile Code. 15 M.R.S.A. § 3314(1)(H) permits a period of confinement in the county jail only in conjunction with a suspended sentence to the Maine Youth Center.

### III. *Sufficiency of the Evidence*

We have not previously been called upon to interpret 17–A M.R.S.A. § 501(2) except with reference to the sufficiency of the complaint thereunder. *See State v. Creamer, supra.* We have, however, in *Creamer* and other cases, adduced certain general principles which we now apply in determining the meaning of 17–A M.R.S.A. § 501(2).

■ When possible, we interpret enactments of the Legislature contained in the criminal code so as to uphold their constitutionality. We must presume that such legislation purports to operate within the limitations of our state and federal constitutions. Both article I, § 4 of the Maine Constitution and the first amendment of the United States Constitution protect the people against governmental encroachment on their freedom of speech. The Maine Constitution is no less restrictive than the Federal Constitution. *Opinion of the Jus-*

*tices,* Me., 306 A.2d 18, 21 (1973). Our fundamental interest in free speech "demands the existence of a compelling governmental interest to justify legislative restrictions upon it." *Id.* at 21. Such a compelling governmental interest has been found to exist in the prohibition of libel, *e. g., Beauharnais v. Illinois,* 343 U.S. 250, 255–257, 72 S.Ct. 725, 729–731, 96 L.Ed. 919 (1952), obscenity, *e. g., Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), or fighting words, *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); *State v. Drake,* Me., 325 A.2d 52, 55 (1974). "[Words] which by their very utterance inflict injury or tend to incite an immediate breach of the peace" do not enjoy constitutional protection. *State v. Hotham,* Me., 307 A.2d 185, 186 (1973), *quoting Chaplinsky v. New Hampshire,* 315 U.S. at 572, 62 S.Ct. at 769 (1942).

■ Although conduct other than speech was described in the amended petition, the evidence viewed in the light most favorable to the state was insufficient to give that conduct any significance under section 501(2). At no time has the state suggested that the words here involved fell within the area of obscenity.[2] As applied to speech, section 501(2) represents the legislative definition of conduct coming within the fighting–words area of unprotected speech. The prosecution herein was similarly aimed at such conduct.

■ A narrow judicial interpretation of criminal statutes affecting speech is necessary in order to insure that they prohibit only speech which is not constitutionally protected. *State v. Sondergaard,* Me., 316 A.2d 367, 369 (1974); *see also, Gooding v. Wilson,* 405 U.S. 518, 522, 92 S.Ct. 1103, 1106, 31 L.Ed.2d 408 (1972), and *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), both cited in *Hotham,* 307 A.2d at 186–187. As we said in *State v. White,* Me., 280 A.2d 810, 812 (1971): "The importance of this requirement becomes ap-

---

**2.** Indeed, the words used by the juvenile, while coarse and vulgar, have become so common-place as to be devoid of any prurient content.

parent when we consider that many forms of conduct and language, although distasteful to certain individuals or even a majority of people, are nevertheless afforded constitutional protection." *Accord, Cohen v. California,* 403 U.S. 15, 25, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *Hess v. Indiana,* 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973). When dealing with fighting words there is a legitimate governmental interest in preventing words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace," but language which is merely distasteful cannot be punished.[3] Application of a criminal statue must be restricted "to a kind of speech that produces or is likely to produce a clear and present danger of substantive evils that Maine constitutionally may seek to prevent." *State v. Porter,* Me., 384 A.2d 429, 432 (1978). *See also, F.C.C. v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978); *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919).

Although there has been some criticism of the words "clear and present danger," the Supreme Court has continued to use them.[4] *E. g., F.C.C. v. Pacifica Foundation,* 438 U.S. at 745, 98 S.Ct. at 3038 (*quoting* Justice Holmes' opinion in *Schenck v. United States, supra*); *see generally* Annot., "Supreme Court's Development of the Clear and Present Danger Rule," 38 L.Ed.2d 835 (1974). Justice Frankfurter, concurring in *Pennekamp v. Florida,* 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946) wrote:

"Clear and present danger" was never used by Mr. Justice Holmes to express a technical legal doctrine or to convey a formula for adjudicating cases. It was a literary phrase not to be distorted by being taken from its context. In its setting it served to indicate the importance of freedom of speech to a free society, but also to emphasize that its exercise must be compatible with the preservation of other freedoms essential to a democracy and guaranteed by our Constitution.

328 U.S. at 353, 66 S.Ct. at 1040, cited with approval in *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 842, 98 S.Ct. 1535, 1543, 56 L.Ed.2d 1 (1978). In *Landmark* the Court, although questioning the relevance of the test to that case, said:

Properly applied, the test requires a court to make its own inquiry into the imminence and magnitude of the danger said to flow from the particular utterance and then to balance the character of the evil, as well as its likelihood, against the need for free and unfettered expression. The possibility that other measures will serve the State's interests should also be weighed.

433 U.S. at 843, 98 S.Ct. at 1543.

■ In the disorderly conduct context, the Supreme Court has never repudiated the use of the words clear and present danger. In *Terminiello v. Chicago,* 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949), the Court held that a conviction under a disor-

---

**3.** *State v. Mockus,* 120 Me. 84, 113 A. 39 (1921), upholding the constitutionality of the criminal statute punishing blasphemy (17 M.R. S.A. § 451, repealed by P.L. 1975, ch. 499, § 5, eff. May 1, 1976), and holding that the first amendment of the federal constitution is inapplicable to state law, can no longer be considered valid. *See Burstyn, Inc. v. Wilson,* 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1951); *State v. West,* 9 Md.App. 270, 263 A.2d 602 (1970); Annot., 41 A.L.R.3d 519, 522 (1972). To the extent that any of the language in *Mockus* is inconsistent with the present decision, it is expressly disavowed.

**4.** The phrase "clear and present danger" was first used by Justice Holmes in *Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247,

249, 63 L.Ed. 470 (1919). It was criticized by Justices Black and Douglas, concurring in *Brandenburg v. Ohio,* 395 U.S. 444, 449–457, 89 S.Ct. 1827, 1830–1834, 23 L.Ed.2d 430 (1969). Justice Douglas wrote that in cases involving advocacy of unlawful action, the "clear and present danger test" can be too easily manipulated to crush legitimate dissent, 395 U.S. at 452, 89 S.Ct. at 1832; Justice Black wrote that "the 'clear and present danger' doctrine should have no place in the interpretation of the first amendment," 395 U.S. at 449–450, 89 S.Ct. at 1831. Some commentators have suggested that the clear and present danger test is obsolete. *See, e. g.,* Corwin, "Bowing Out 'Clear and Present Danger'," 27 Notre Dame L.Rev. 325 (1952).

derly conduct ordinance was unconstitutional because there was no showing that the speech made by the defendant was likely to produce a clear and present danger of substantive evil. The Court affirmed a disorderly conduct conviction in *Feiner v. New York*, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295 (1951), based on a finding that there was a clear and present danger of disorder. Following the approach of these decisions, the constitutionality of a conviction under a Maine statute must be tested according to the balancing process described in *Landmark Communications, Inc., supra*, in the passage quoted above.

With these general principles in mind and viewing the evidence in the light most favorable to the State, we turn to the facts of this case. Shortly after 1:00 a. m. on the night of April 1, 1979, John W., a juvenile, was driving his car in Saco accompanied by his older sister, Maria. Saco police officer Ronald Rochefort stopped them, approached the car and asked John for his license and registration. When Maria asked why they had been stopped, Rochefort said nothing.[5] Maria got out of the car and again asked why they had been stopped and Rochefort again refused to answer. Maria came out into the street and began yelling. Rochefort took her back to the sidewalk and went back to the driver's window, whereupon Maria began calling him a "fucking pig" and prevented him from talking to the driver. Rochefort arrested Maria for disorderly conduct, took her to his car, and handcuffed her. She later entered a guilty plea to the charge of disorderly conduct.

Shortly after Maria's arrest Officer Bradley Paul arrived in another police cruiser. John W. was getting out of his car and approaching Rochefort's cruiser. John asked both Rochefort and Paul what was going on. Officer Paul walked toward John and advised him that Rochefort had arrested his sister for disorderly conduct. John hollered, "I want to know what the hell is going on." Paul again explained

that his sister had been arrested for disorderly conduct. John kept repeating, "I want to know what the hell is going on." Officer Paul tried to explain to John that he should come to the station and arrange for bail for his sister. John became more abusive so Officer Paul turned and walked back to his cruiser. As Officer Paul walked away, John screamed at him, "Hey, turn around and come back here" and "Hey, you fucking pig, you fuckin' kangaroo." Officer Paul then ordered John to get back into his car. John hollered, "Fuck you." Officer Paul thereupon arrested him.

■ The disorderly conduct statute applied to these facts by the juvenile court, 17–A M.R.S.A. § 501(2), reads as follows:

A person is guilty of disorderly conduct if:

.    .    .    .    .

2. In a public or private place, he knowingly accosts, insults, taunts or challenges any person with offensive, derisive or annoying words, or by gestures or other physical conduct, which would in fact have a direct tendency to cause a violent response by an ordinary person in the situation of the person so accosted, insulted, taunted or challenged. . . .

17–A M.R.S.A. § 10(2)(A) provides that

A person acts knowingly with respect to a result of his conduct when he is aware that it is practically certain that his conduct will cause such a result.

17–A M.R.S.A. § 11(4) provides that

Unless otherwise expressly provided, a culpable state of mind need not be proved with respect to:

.    .    .    .    .

B. Any element of the crime as to which it is expressly stated that it must "in fact" exist.

Section 501(2) therefore requires that the state prove that the defendant acted knowingly to the extent that he was aware that he was accosting, insulting, taunting or

---

5. There was evidence upon which the juvenile court could have found the original stop was legitimately based on a traffic violation.

challenging a person with offensive, derisive or annoying words or gestures, but it does not require the state to prove that the defendant knew that his conduct "would have a direct tendency to cause a violent response."

■ The words "any person" in § 501(2) includes Police Officer Paul. *See Bale v. Ryder*, Me., 290 A.2d 359 (1972). The words used by John W. are certainly offensive, derisive or annoying words that taunted and insulted Officer Paul. The evidence was sufficient to support a finding that John was aware that it was practically certain that his conduct would cause Officer Paul to be taunted or insulted.

We must, however, conclude that John W.'s conduct was not such as "would in fact have a direct tendency to cause a violent response by an ordinary person *in the situation of the person so . . . . insulted or taunted.*" (Emphasis added.) Assuming without deciding that John W.'s conduct would have been sufficient if directed at some other person, we must look to the particular situation of the very person insulted or taunted. We do so to insure that our application of the statute will pass constitutional muster.

■ In *Chaplinsky v. New Hampshire, supra*, the Supreme Court upheld a conviction under a New Hampshire disorderly conduct statute, based on a construction of the statute by the New Hampshire Supreme Court which limited its application to prohibit only

> face to face words plainly likely to cause a breach of the peace by the addressee, words whose speaking constitute a breach of the peace by the speaker . . . .

315 U.S. at 573, 62 S.Ct. at 770 *quoting from State v. Chaplinsky*, 91 N.H. 310, 319, 18 A.2d 754, 762 (1941). The emphasis in *Chaplinsky* was thus on the nature of the words spoken, not on the subjective response of the actual addressee. But while the test in *Chaplinsky* was objective, it was *not wholly abstract*; it did not make certain words punishable whenever and wherever they were used. On the contrary, the opinion plainly contemplated that courts enforcing disorderly conduct statutes must look to the actual situation in which the words were used, in order to punish only words which, when they were used, were "plainly likely" to cause a breach of the peace. The New Hampshire Court's opinion in *Chaplinsky*, quoted by the Supreme Court, noted that even classic fighting words are only fighting words "when said without a disarming smile." 315 U.S. at 573, 62 S.Ct. at 770, *quoting* 91 N.H. at 319, 18 A.2d at 762. It is clear 17–A M.R.S.A. § 501(2) requires that fact finders look to the specific context in which words were spoken. Fact finders need not look to the subjective response of the actual addressee, but they must consider the *situation* of that addressee. In particular, the fact finder must consider those personal attributes of the addressee which were reasonably apparent because those attributes are a part of the objective situation in which the conduct occurred. Thus, when John W. addressed a police officer who was assisting in the arrest of his sister, those facts must be considered part of the situation in which the juvenile's language must be evaluated.

■ In the years since *Chaplinsky*, the Supreme Court has never expressly altered its analysis of fighting words. Some courts and commentators have concluded that the Court shifted the focus of the definition of fighting words to the subjective response of the actual addressee in *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); indeed, Justices Blackmun and Burger, dissenting in *Gooding*, charged that the Court was "merely paying lip service to *Chaplinsky*." 405 U.S. at 537, 92 S.Ct. at 1113. *E.g., Downs v. Maryland*, 278 Md. 610, 366 A.2d 41, 44 (1976); Shea, *Don't Bother to Smile When You Call Me That: Fighting Words and the First Amendment*, 63 Ky.L.J. 1 (1974); Comment: *The Fighting Words Doctrine: Is There a Clear and Present Danger Standard?*, 84 Dickinson L. Rev. 75, 88 (1979). We do not so read *Gooding*. The majority struck down the Georgia breach of the peace statute as unconstitutionally overbroad because, as construed by the Georgia courts, the statute

could be, and had been, applied "to utterances where there was no likelihood that the person addressed would make an immediate violent response." We are not persuaded that requiring a *likelihood* of an immediate violent response is the same thing as requiring an *actual* immediate violent response.[6]

The Supreme Court has not elaborated the concept of fighting words with examples. However, several decisions have established general guidelines. *Cohen v. California*, 403 U.S. 15, 23, 91 S.Ct. 1780, 1787, 29 L.Ed.2d 284 (1971), held that merely offensive or vulgar language could not be punished, at least when addressed to an audience which was not "captive." In *Lewis v. New Orleans*, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974), a case similar to *Gooding, supra*, the Court found that a statute which punished "opprobrious" language was overboard. Several other cases have been remanded for reconsideration in light of *Gooding* and *Cohen*, e. g., *Rosenfeld v. New Jersey*, 408 U.S. 901, 92 S.Ct. 2479, 33 L.Ed.2d 331, and *Brown v. Oklahoma*, 408 U.S. 914, 92 S.Ct. 2507, 33 L.Ed.2d 338 (1972). Later cases were remanded for reconsideration in the light of *Lewis: Lucas v. Arkansas*, 416 U.S. 919, 94 S.Ct. 1917, 40 L.Ed.2d 276 (1974); *Kelly v. Ohio*, 416 U.S. 923, 94 S.Ct. 1922, 40 L.Ed.2d 280 (1974); *Rosen v. California*, 416 U.S. 924, 94 S.Ct. 1922, 40 L.Ed.2d 280 (1974); *Karlen v. Cincinnati*, 416 U.S. 924, 94 S.Ct. 1922, 40 L.Ed.2d 280 (1974). In *Hess v. Indiana*, 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973), the Court held that offensive language not directed at any person or group in particu-

lar could not be punished as fighting words, following *Cantwell v. Connecticut*, 310 U.S. 296, 309, 60 S.Ct. 900, 905, 84 L.Ed. 1213 (1940).

In *Thompson v. Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960), the Court reversed a disorderly conduct conviction where the only evidence was that the defendant had been ·"argumentative" with the officers who arrested him, asking what he was being arrested for. The Court found that

> There is no testimony that petitioner raised his voice, used offensive language, resisted the officers or engaged in any conduct of any kind likely in any way to adversely affect the good order and tranquility of the City of Louisville. . . . [M]erely "arguing" with a policeman is not, because it could not be, "disorderly conduct" under the substantive law of Kentucky.

362 U.S. at 205–206, 80 S.Ct. at 629.

█ In *Norwell v. Cincinnati*, 414 U.S. 14, 94 S.Ct. 187, 38 L.Ed.2d 170 (1973), the Court held that a 69–year–old man who objected to detention by a police officer in a manner that was "hostile" and "annoying" to the officer, could not be punished for disorderly conduct because the record clearly showed that there were no "abusive language or fighting words." The Court did not attempt to suggest what would have constituted such language. It is at least clear, however, that "fighting words" implies a direct, face–to–face confrontation and provocation; it is also particularly clear that arguing with an arresting officer is not

6. There are of course other ways in which words can constitute a criminal offense. In particular, under 17–A M.R.S.A § 209, "A person is guilty of criminal threatening if he intentionally or knowingly places another person in fear of imminent bodily injury." Under 17–A M.R.S.A § 210,

> 1. A person is guilty of terrorizing if he communicates to any person a threat to commit or to cause to be committed a crime of violence dangerous to human life, against the person to whom the communication is made or another, and the natural and probable consequence of such a threat, whether or not such consequence in fact occurs, is:

> A. To place the person to whom the threat is communicated or the person threatened in reasonable fear that the crime will be committed; or

> B. To cause evacuation of a building, place of assembly or facility of public transport.

See *State v. Fischer*, Me., 398 A.2d 402, 404–405 (1979); *State v. Porter*, Me., 384 A.2d 429 (1978) (upholding the constitutionality of Section 210); *State v. Sondergaard*, Me., 316 A.2d 367 (1974) (construing and upholding the former 17 M.R.S.A. § 3701 (repealed, P.L. 1975, ch. 499, § 20, eff. May 1, 1976), which punished "threatening communications").

per se disorderly conduct. We must bear in mind Justice Harlan's characterization, in *Cohen*, of those who might be willing to strike out upon the hearing of any vulgarity as "lawless and violent." 403 U.S. at 23, 91 S.Ct. at 1787. *See also Papish v. Board of Curators*, 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973); Annot., 39 L.Ed.2d 925 (1976).

■ Because we hold that the evidence was insufficient for a conviction under section 501(2), we need not settle all of the uncertainty surrounding *Gooding* and the Supreme Court's present approach to fighting words. Neither are we limited to an interpretation of first amendment guarantees since our decision herein also is based upon article I, section 4 of the Maine Constitution. We base our interpretation of section 501(2), as applied to this case, on a minimum requirement that words which are not objectively likely to cause a breach of the peace, in the situation in which they are used, are not fighting words and may not be punished under either the Federal or the Maine Constitution.

Many other courts, faced with the task of determining what constitutes fighting words, have applied tests quite similar to that applied by § 501(2), tests which are objective, but which focus on the context of the incident rather than solely on the content of the words. *See, e. g., Hammond v. Adkisson*, 536 F.2d 237 (8th Cir. 1976) (words must be employed *"under such circumstances* that they were likely to arouse to immediate and *violent* anger the person to whom the words were addressed" (emphasis in original)); *Morris v. State*, Fla., 335 So.2d 1, 2 (1976) and *Harbin v. State*, Fla.App., 358 So.2d 856, 857 (1978) (overturning convictions for using profanity to police officers on the ground that the words did not "tend to incite an immediate breach of the peace"); *Commonwealth v. A Juvenile*, 368 Mass. 580, 587, 334 N.E.2d 617, 624–625 (1975) (fighting words must be "personally abusive . . . in the sense that they are a face to face personal insult," but "the determination may not rest on subjective perceptions since 'an undifferen-

tiated fear . . . of disturbance is not enough to overcome the right to freedom of expression,'" *quoting Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)); *State v. Hoskins*, 35 Conn.Sup. 587, 401 A.2d 619 (1978) ("'fighting words' concept has two aspects . . . the quality of the words themselves . . . [and] the circumstances under which the words are used"); *State v. Authelet*, R.I., 385 A.2d 642, 649 (1978) ("[fighting words] must be personally abusive and inherently likely to provoke violent reaction").

■ In the present case, the person taunted or insulted was a police officer. Tracking the wording of § 501(2), we hold that "an ordinary person in the situation of the [police officer] so . . . insulted [or] taunted" means an ordinary police officer in that situation. We presume that a police officer would not so readily respond violently to conduct of the sort engaged in by John W. To constitute a violation of the statute in these circumstances the conduct must be egregiously offensive, so offensive as to have a direct tendency to cause a violent response even from a police officer. The word "direct" contained in the statute refers to the necessity of finding a clear and present danger of an immediate breach of peace.

We adopt the view expressed by Justice Powell, concurring in the Supreme Court's first decision in *Lewis v. City of New Orleans*, 408 U.S. 913, 92 S.Ct. 2499, 33 L.Ed.2d 321 (1972):

> [T]he issue in a case of this kind is whether "fighting words" were used. Here a police officer, while in the performance of his duty, was called "G_____ D_____ M_____ F_____" police.

> If these words had been addressed by one citizen to another, face to face and in a hostile manner, I would have no doubt that they would be "fighting words." But the situation may be different where such words are addressed to a police officer trained to exercise a higher degree of restraint than the average citizen. See Model Penal Code § 250.1, Comments, at p.14 (Tent. Draft No. 13, 1961).

On remand, the Supreme Court of Louisiana affirmed the conviction of Mrs. Lewis. The Supreme Court reversed, finding that the Louisiana Court had failed to cure the statute of overbreadth. 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974). Again concurring, Justice Powell commented that whether or not words are fighting words should depend on the particular circumstances. He found that the Louisiana statute, as construed,

> confers on police a virtually unrestrained power to arrest and charge persons with a violation  .   .   .. The present type of ordinance tends to be invoked only when there is no other valid basis for arresting an objectionable or suspicious person."

415 U.S. at 135–136, 94 S.Ct. at 973.

As the Florida appellate court pointed out in *Harbin v. State, supra,* a police officer is responsible for keeping the peace, yet in these prosecutions, the police officer is often "the only person who arguably could have been 'incited to an immediate breach of the peace.'" 358 So.2d at 857. The Appellate Court of Illinois has said:

> An officer of the law must exercise the greatest degree of restraint in dealing with the public. He must not conceive that every threatening or insulting word, gesture, or motion amounts to disorderly conduct. It may be of such a character or so provoked or conditioned as to be fully justified.   .   .   .
>
> .   .   . [W]ords addressed to an officer in an insolent manner do not without any other overt act tend to breach the peace because it is the sworn duty and obligation of the officer not to breach the peace and beyond this to conduct himself so as to keep others from so doing. He has an obligation to exercise a great degree of restraint in dealing with the public and should not permit abusive statements to so arouse him that he will commit a breach of the peace.

*Oratowski v. Civil Service Commission,* 3 Ill.App.2d 551, 561, 123 N.E.2d 146, 151

(1954) (citations omitted). The Model Penal Code Comment cited by Justice Powell in *Lewis I, supra,* suggests that a person should be convicted only for "extremely offensive behavior supporting an inference that the actor wished to provoke the policeman to violence." Model Penal Code, § 250.1, Comments, at p. 18 (Tentative Draft #13, 1961).

*Bale v. Ryder,* Me., 290 A.2d 359 (1972), involved a suit for false arrest against a police officer who had arrested the plaintiff for disorderly conduct after the plaintiff directed an obscenity at him. The disorderly conduct statute then in force, 17 M.R.S.A. § 3953, made it an offense to "annoy or interfere with any person" by offensive language. The Superior Court instructed the jury that "any person" did not include the defendant, i. e. that it excluded police officers entirely. We reversed, quoting the following language:

> While   .   .   . not every abusive epithet directed toward police officers would   .   .   . justify arrest for disorderly conduct, there is no sound reason why officers must be subjected to indignities that go far beyond what any other citizen might reasonably be expected to endure. *City of St. Paul v. Morris,* (Minn. 1960) 258 Minn. 467, 104 N.W.2d 902, 903.

290 A.2d at 361.

The wording of 17–A M.R.S.A. § 501(2) is substantially different from the version of 17 M.R.S.A. § 3953 considered in *Bale.* We find no conflict, however, between our present holding and the language quoted above. Abuse "far beyond what any other citizen might reasonably be expected to endure" need not be endured by the police. But epithets directed at police officers are not fighting words merely because they might be so if directed at some other person. The nature of the experience, training and responsibilities of police officers must be considered in determining whether a given defendant's language constituted fighting words.[7]

---

7.  *State v. Lizotte,* Me., 256 A.2d 439 (1969) involved a prosecution under the former 17

M.R.S.A. § 3701 (repealed, P.L. 1975, ch. 499, § 20, eff. May 1, 1976) for threatening to kill a

■ In this case, the police initially had intruded into the activities of the persons involved. The police had accosted the juvenile and his sister and had arrested his sister. Persons involved in an arrest have a right under both the Maine and the United States Constitution, to remonstrate, to object, or to protest the arrest.[8] We do not condone or encourage abusive language, but even crude speech may be entitled to constitutional protection, *Cohen v. California, supra,* and the weight of that constitutional protection is heavier after a police intrusion. The right to remonstrate against a police intrusion into our activities is one element which distinguishes our democratic society from the police state. See 9 Harv. Civil Rights–Civil Liberties L.Rev. 1, 10 (1974) (arguing that speech addressed to any public official has a "political" aspect, bringing it within the central concerns of the first amendment).

In *People v. Justus,* 57 Ill.App.3d 164, 166, 14 Ill.Dec. 836, 838, 372 N.E.2d 1115, 1117 (1978), the Appellate Court of Illinois, *citing Oratowski, supra,* said:

> Arguing with a police officer, even if done loudly, will not of itself constitute disorderly conduct . . . .
>
> Defendant's conduct may have been intemperate, unreasonable and unjustified, but there is no proof that her actions caused public disorder.

*See also State v. McKenna,* R.I., 415 A.2d 729 (1980); *People v. Slaton,* 24 Ill.App.3d 1062, 322 N.E.2d 553 (1974); *City of Chicago v. Hopson,* 131 Ill.App.2d 591, 266 N.E.2d 363 (1970). These words apply equally well to the present case.[9]

■ In conclusion, we hold that John W.'s language and accompanying conduct while engaged in the permissible activity of

verbally protesting the arrest were not so egregiously offensive and likely to provoke a violent response as to forfeit the protection of art. I, § 4 of the Maine Constitution and the first amendment of the Federal Constitution; and thus we hold that there was no violation of 17–A M.R.S.A. § 501(2). Since the elements of the juvenile crime were not supported by evidence of guilt beyond a reasonable doubt, the juvenile court should have ordered the petition dismissed and the juvenile discharged under 15 M.R.S.A. § 3310(4).

The entry is:

Appeal sustained.

Judgment reversed.

Remanded to the Superior Court for remand to the Juvenile Court with instructions to dismiss the juvenile petition.

All concurring.

---

police officer. We held that it did not matter whether defendant succeeded in frightening a police officer, as long as defendant "used words which would under the circumstances then existing be heard by an ordinary person as being spoken not in jest but as carrying serious promise of death." 256 A.2d at 442. We do not regard *Lizotte* as conflicting with our present opinion, as it dealt with a threat rather than with merely offensive language.

**8.** U.S.Const. Amend. I; Me.Const. art. I, § 4. *See also* Me.Const. art. I, § 15.

**9.** We do not suggest that the state is without power consistent with the rights of free speech and assembly to control confrontations between *its* citizens and the police as it has done in several other sections of 17–A M.R.S.A., Chapter 21: *e. g.,* sections 501(3), 502, 503, 504, 505 and 509.