**STATE of Maine**

v.

**Ellen GRIATZKY.**

Supreme Judicial Court of Maine.

Argued Jan. 29, 1991.
Decided Feb. 27, 1991.

William R. Anderson, Dist. Atty., Geoffrey Rushlau, Asst. Dist. Atty. (orally), Bath, for plaintiff.

Mark Susi (orally), Farris & Susi, Gardiner, for defendant.

Before ROBERTS, WATHEN, GLASSMAN, CLIFFORD, COLLINS and BRODY, JJ.

WATHEN, Justice.

Defendant Ellen Griatzky appeals from her convictions of failure to disperse, 17–A M.R.S.A. § 502 (1983), and disorderly conduct, 17–A M.R.S.A. § 501 (1983), resulting from a jury trial in the Superior Court (Sagadahoc County, *Bradford, J.*). On appeal, defendant contends that the State's closing argument was improper, that a person cannot be convicted of failure to dis-

perse for refusing to leave her own residence, and that the evidence is insufficient to uphold her conviction of disorderly conduct. We affirm the judgments.

The relevant facts may be summarized briefly as follows: At approximately 9:00 p.m. on May 27, 1988, Richmond Police Officer Joel Davis responded to a complaint about drinking and tire squealing at the waterfront park. Davis asked a group of about ten people to leave the area. Shortly thereafter, however, he realized that this group had not actually dispersed, but simply moved across the street to join another larger group in a parking lot. When he received a second complaint, Davis warned the crowd to quiet down. At about this time, he spoke with defendant, who was quietly walking with friends, and asked her to "please tell the people [at the parking lot] to quiet down." Later, after observing some fireworks going off, Davis and Officer James Jordan returned to the parking lot and asked the crowd "to leave and not gather up any place else in town." The crowd responded by yelling obscenities and throwing beer bottles and cans at the police cruiser.

The officers decided to call for additional support. Eventually Police Chief Donald MacKenzie, Corporal William Robbins, Sheriff David Haggett, two deputies, and some state police officers arrived. After several more trips to the parking lot, Corporal Robbins and Chief MacKenzie reported that things had quieted down and the problem was resolved. Around 1:00 a.m. however, Sheriff Haggett discovered that a group of approximately 12–20 people was re-gathering in the parking lot of an apartment building. The Sheriff testified that, as he was getting out of his vehicle, he heard a female voice shouting, "What does this fucking asshole think he can do?" He walked in the direction of the voice and encountered defendant standing on the porch of the apartment building. He testified that defendant became belligerent and confrontational, and shouted directly into his face. "These fucking assholes can't do anything; we left the park." At this point he ordered everyone to disperse. She re-

sponded as follows: "Fuck you. This is my house and you can get the fuck out of here," and "I'd like to see you arrest me in my house, you fucking asshole." Haggett took hold of her left wrist, placing her under arrest for disorderly conduct and failure to disperse. Defendant pulled away from him and when someone shoved him, she ran into the crowd. A deputy grabbed her, and she was eventually subdued by using chemical mace.

At the conclusion of the trial the prosecuting attorney made the following statement during his final argument:

> These police officers are not lying to you. They are not trying to hide anything that was done wrong that night on this defendant here. They are telling you what happened in the course of what really developed into a chaotic and almost riotous situation. On the other hand the defendant and her witnesses, I suggest to you, are not telling you what happened. They may just not know. They may be mistaken. Some of them know and are just not telling you the truth.

The jury returned verdicts of guilty and defendant appeals.

## I

■ Although there was no objection at trial, defendant contends on appeal that the improper argument of the prosecutor requires the granting of a new trial. We note the Superior Court chastised the prosecutor and instructed the jury to disregard his remarks. In *State v. Reilly*, 446 A.2d 1125 (Me.1982), we stated that a prosecutor's closing argument, claiming that defense counsel knew and had conceded that the police were telling the truth and the defendant was lying, constituted prosecutorial overkill and violated M. Bar R. 3.7(e). *Id.* at 1129. In instances such as this, where the State errs in "demarking the boundary between proper and improper conduct," a new trial may be required, but not when "[p]rompt and appropriate curative instructions" have "alleviate[d] the damage caused by such conduct." *Id.* Because the principal underlying issue at trial was the characterization of defendant's conduct rather than the credibility of the witnesses, we conclude that the curative instruction easily precluded any need for a new trial.

## II

■ Defendant next argues that she may not be convicted of failure to disperse from the porch or the parking lot of an apartment building in which she is a tenant. Maine law provides that "a law enforcement officer may order the participants and others in the immediate vicinity to disperse" whenever "6 or more persons are participating in a course of disorderly conduct likely to cause substantial harm or serious inconvenience, annoyance, or alarm." 17–A M.R.S.A. § 502(1). It is a criminal offense if one fails to comply with such an order.

Defendant argues that section 502 permits an unconstitutional invasion of privacy, citing art. I, § 1 of the Constitution of the State of Maine. She contends that "[a]n individual has a reasonable expectation of privacy and an expectation that there will [be] no unreasonable intrusion on his liberties while at his own place of residence." We need not reach the constitutional issue because defendant had no reasonable expectation of privacy with regard to the outside porch or parking lot of her apartment building. No person may be convicted of failure to disperse unless disorderly conduct is occurring at the time of the order. 17–A M.R.S.A. § 502(1). Disorderly conduct, under 17–A M.R.S.A. § 501(1), can occur only in a public place, which is defined as "a place to which the public at large or a substantial group has access, including but not limited to … (3) the lobbies, hallways, lavatories, toilets and basement portions of apartment houses…." 17–A M.R.S.A. § 501(5)(A)(3). A porch and parking lot used in common by the tenants of an apartment building are at least as public as an apartment lobby, hallway or basement. Defendant had no reasonable expectation of privacy in these common areas. The jury rationally concluded that others were engaged in disorderly conduct as described in section 501(1),

and that defendant failed to comply with the sheriff's lawful order to disperse. Thus, the judgment must stand.

## III

▮ The criminal complaint for disorderly conduct against defendant alleged that she made the four statements attributed to her by Sheriff Haggett. He testified that she made these verbally abusive statements and was belligerent, confrontational, yelled in a loud voice and shouted into his face. As he arrested her for disorderly conduct and failure to disperse, violence erupted resulting in several skirmishes between the police and others on the porch and at least four other arrests. Relying on *State v. John W.*, 418 A.2d 1097 (Me.1980), and *State v. Janisczak*, 579 A.2d 736 (Me. 1990), defendant argues that words alone will never support a conviction for disorderly conduct when the words are addressed to a police officer. We disagree. Although a higher standard is applicable when dealing with words directed to a police officer, the words in this case, considered in context, rationally support the conviction.

In *State v. John W.*, we interpreted section 501(2) narrowly in order to exclude constitutionally protected speech from its purview.[1] We concluded that "[a]s applied to speech, section 501(2) represents the legislative definition of conduct coming within the fighting-words area of unprotected speech." *Id. See Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed 1031 (1942); *State v. Drake*, 325 A.2d 52, 55 (Me.1974); *State v. Hotham*, 307 A.2d 185, 186 (Me.1973) (" '[I]nsulting or "fighting" words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace' " do not enjoy constitutional protection.) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. at 572, 62 S.Ct. at 769).

▮ When dealing with fighting words, the government has a legitimate interest in preventing speech which may incite an immediate breach of the peace, but the use of language which is merely distasteful or offensive cannot be punished. "Application of a criminal statute must be restricted 'to a kind of speech that produces or is likely to produce a clear and present danger of substantive evils that Maine constitutionally may seek to prevent.' " *State v. John W.*, 418 A.2d at 1102 (quoting *State v. Porter*, 384 A.2d 429, 432 (Me.1978)). In testing the constitutionality of a conviction under a Maine statute, the following balancing process must be applied:

> "[A] court [must] make its own inquiry into the imminence and magnitude of the danger said to flow from the particular utterance and then to balance the character of the evil, as well as its likelihood, against the need for free and unfettered expression. The possibility that other measures will serve the State's interests should also be weighed."

*State v. John W.*, 418 A.2d at 1102 (quoting *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 843–44, 98 S.Ct. 1535, 1543, 56 L.Ed.2d 1 (1978)). In employing this balancing process we "focus on the context of the incident rather than solely on the content of the words." *State v. John W.*, 418 A.2d at 1106.

One significant contextual aspect in *State v. John W.* was the fact that the verbal abuse was directed at a police officer. John W., a juvenile, was legitimately protesting his sister's arrest and resorted to verbal abuse as the officer walked away. At that point there were two officers at the scene of the traffic stop and the defendant's sister was in custody in the police cruiser. Because police officers are trained to exercise a higher degree of re-

---

1. Disorderly conduct is defined in relevant part as follows:
  A person is guilty of disorderly conduct if:

  .   .   .   .   .

  2. In a public or private place, he knowingly accosts, insults, taunts or challenges any person with offensive, derisive or annoying words, or by gestures or other physical conduct, which would in fact have a direct tendency to cause a violent response by an ordinary person in the situation of the person so accosted, insulted, taunted or challenged....
17–A M.R.S.A. § 501(2).

straint than the average citizen, we presumed that "a police officer would not so readily respond violently to conduct of the sort engaged in by John W." *Id.* at 1106. Thus we found that section 501(2) had not been violated because of the absence of any words or conduct which would in fact have a direct tendency to cause a violent response by an ordinary police officer in that situation. We did not hold that police officers must endure abuse far beyond what any other citizen might be expected to endure, nor did we hold that words alone could never constitute disorderly conduct when directed at a police officer. Rather we stated: "To constitute a violation of the statute in these circumstances the conduct must be egregiously offensive, so offensive as to have a direct tendency to cause a violent response even from a police officer." *Id.* The case before us is such a case.

■ There are a number of characteristics that distinguish the present case from *State v. John W.* There, the defendant was responding to a police intrusion that had just occurred and he was engaged in the protected activity of protesting an arrest. Here, the verbal abuse began in advance of police intrusion and arrest. There the remarks were delivered as the police officer walked away from the defendant in preparation for leaving the scene. Here, the remarks occurred just as the officer arrived and without apparent provocation. The remarks in *State v. John W.* were delivered on an empty road at one o'clock in the morning with only the defendant and his sister present in addition to the officers. The remarks in this case were delivered at the same hour of the day, but in the presence of a large and unruly group that had exhibited a tendency toward violent acts and fulfilled that tendency immediately after the comments in question. The verbal abuse in *State v. John W.* consisted solely of name calling, whereas the present case involves abusive language challenging the officer's authority and implicitly exhorting the assembled group to join in that challenge and to resist the order to disperse. *State v. John W.* involved no conduct in addition to the verbal abuse, whereas here defendant engaged in confrontational posturing and physically pulled away from the sheriff after he placed her under arrest for failure to disperse. In such circumstances, we readily conclude that the evidence was sufficient to rationally persuade a jury that defendant's remarks and her conduct presented a clear and present danger of an immediate breach of the peace even when directed toward a police officer. This is not a case in which the police have resorted to a thinly disguised charge of disorderly conduct in order to arrest an objectionable or suspicious person. Rather, the police arrested defendant because of the violent response her "fighting words" could reasonably have provoked in that situation, even from an ordinary police officer.

The entry is:

Judgments of conviction affirmed.

All concurring.