Filed 3/29/22  P. v. Araujo CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

<table>
<tr><td>THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ROSA ADRIANA ARAUJO,<br><br>     Defendant and Appellant.</td><td>A161761<br><br>(San Mateo County<br>Super. Ct. No. SC066583A)</td></tr>
</table>

Rosa Adriana Araujo was convicted in 2008 of three felony counts of attempting to deter or resisting an executive officer in the performance of duty by means of threats or violence.  She now appeals from denials of her motions to reduce the convictions to misdemeanors and dismiss them.  Araujo challenges the trial court's decision on a number of grounds, including that it constituted punishment in violation of her constitutional right to freedom of speech, the prosecution used improper methods and the court considered improper factors.  She also argues various fines and fees imposed when she was sentenced must be vacated due to subsequently enacted legislation.  As we will explain, although we do not agree with all of Araujo's claims of error, we find reversal necessary because we are unable to conclude the trial court exercised its discretion impartially.

1

## BACKGROUND

Araujo's offenses occurred in February 2008, when police officers went to her parents' house to conduct a probation search on her brother. As described in greater detail in our unpublished opinion affirming Araujo's convictions, according to the testimony of officers who were at the scene, Araujo arrived at the house shortly after the search had begun, irate, repeatedly yelling, "get the fuck out of my house, you fucking pigs," demanding to see a warrant, and saying her brother did not live there and was not on probation.

As Sergeant Peruzzaro tried to explain no warrant was required and warned she would be arrested if she obstructed the investigation, Araujo continued yelling the same things, as well as something like "die you fucking pigs, 187 on a cop," which officers understood as a reference to the Penal Code section for homicide. She started to walk toward the back of the house and Peruzzaro stepped in front of her, concerned because he knew the officer searching the brother's room had found a loaded gun and was trying to unload it. Araujo spit at Peruzzaro, hitting his arm and hand, and continued down the hall, yelling obscenities and "nigger" at Detective Stewart, an African-American officer who was in front of her.

Detectives Stewart and Teixeira attempted to put Araujo's hands behind her back to handcuff and arrest her and she resisted, trying to twist out of their grasp and saying to Stewart, "Fuck you nigger." She continued to resist after being handcuffed, turning her body from left to right, squeezing the officers' fingers, spitting on them, stomping on their feet, and at one point grabbing Stewart's crotch. She called Stewart "nigger" more than 30 times, called him a "porch monkey" several times, and told him he "needed to go back to Africa."

2

As the officers started to move Araujo out of the house, she began yelling that they were raping and sexually assaulting her, as well as continuing to yell "nigger." She put her hand on the holster of Teixeira's gun; he slapped it away and told her to stop, and, when she ignored repeated directions to stop resisting, he squeezed the back of her neck and she stopped.

During the struggle, Araujo's racial epithets were directed only at Stewart, not at Teixeira. Officer Wong put a spit hood on Araujo because he saw spit "flying everywhere" and hitting the detectives, and she called him a "chink."

After a trial in 2008, the jury found Araujo guilty of the three charged felony counts of attempting to deter or resisting an executive officer in the performance of duty by means of threats or violence (Pen. Code, § 69).[1] The jury found not true a hate crime allegation attached to the count involving Officer Stewart (§§ 422.55, 422.75, subd. (a)).

On January 16, 2009, the trial court suspended imposition of sentence and placed Araujo on three years' probation, with conditions including that she serve 45 days in county jail. Araujo was ordered to pay a $200 restitution fine (§ 1202.4), a $30 criminal conviction assessment (Gov. Code, § 70373), a $20 court security surcharge (§ 1465.8),[2] and a probation supervision fee of

---

[1] Further statutory references will be to the Penal Code unless otherwise specified.

An additional count, making a criminal threat (§ 422), was charged but did not go to trial.

[2] The section 1465.8 assessment is now referred to as a court operations assessment. (Legis. Counsel's Dig., Sen. Bill No. 118 (2011-2012 Reg. Sess.) Stats. 2011, Summary Dig.)

not more than $75 per month (former § 1203.1b).[3]  The probation supervision fee was expressly not a condition of probation.

On May 8, 2009, the probation department alleged that Araujo violated probation by failing to follow reasonable directives of the probation officer to remain still and compliant during a routine probation search.  The incident occurred when probation officers attempting to conduct a routine probation search on Araujo and her brother met resistance from Araujo's mother and brothers.  Araujo yelled at the officers, accused them of hurting her mother, and, when an officer grabbed her arm to her lunging at the officers and her mother, continued to move toward them.  Araujo ignored repeated directions to stop moving, called the probation officer a "bitch," and numerous times called the police officers "pigs."

A memorandum from the probation officer to the court stated that Araujo had been cooperative and respectful during her probation orientation, and said she needed help and wanted to attend counseling, but since release from jail she had become confrontational and defensive.  She said counseling was a financial burden, as she worked for her father, but he did not pay her.  The probation officer had encouraged her to seek other employment, but Araujo had made no effort to do so.

---

[3] At the sentencing hearing, the trial court also heard an alleged probation violation in a separate misdemeanor battery case.  Araujo admitted violating probation by failing to pay victim restitution of $1,520.14.  Defense counsel explained that Araujo did not have financial ability to pay the ordered restitution because she worked at her father's restaurant in exchange for room and board at her parents' house, earning only tips, but acknowledged Araujo had not made even minor attempts to pay.  Araujo told the court she had been trying to change her behavior.  The court reinstated probation and referred Araujo to Revenue Services to work out a payment plan.

Araujo admitted the violation and the court revoked probation, then immediately reinstated it under the previously imposed terms and conditions, with the additional condition that Araujo serve 60 days in county jail with 45 days credit for time served.

In 2010, we filed our opinion affirming the January 2009 judgment. (*People v. Araujo* (Nov. 17, 2010, A124225) [nonpub. opn.].)

On July 8, 2014, Araujo, in propria persona, filed a petition to reduce her felony convictions to misdemeanors (§ 17, subd. (b)) and dismiss the action (§ 1203.4). The motion was denied on January 13, 2015. Araujo filed a second motion seeking the same relief on August 28, 2018, which the trial court denied on September 28, 2018.

On October 22, 2020, counsel for Araujo filed another motion for reduction of the convictions to misdemeanors and dismissal. The prosecution filed opposition and after a hearing on December 4, 2020, the trial court denied the motion.

This appeal followed.

## DISCUSSION

Araujo's motions sought two forms of relief, reduction of the convictions from felonies to misdemeanors and dismissal of the convictions. Section 17, subdivision (b), governs the circumstances in which "wobbler" offenses such as Araujo's, which can be treated as either felonies or as misdemeanors (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1510), are deemed misdemeanors. Araujo's offenses were charged as felonies. " ' "A wobbler offense charged as a felony is regarded as a felony for all purposes until imposition of sentence or judgment. [Citations.] If state prison is imposed, the offense remains a felony; if a misdemeanor sentence is imposed, the offense is thereafter deemed a misdemeanor. [Citations.]" ' (*People v. Upsher*

5

(2007) 155 Cal.App.4th 1311, 1320.)  The trial court has discretion to 'reduce a wobbler to a misdemeanor either by declaring the crime a misdemeanor at the time probation is granted or at a later time—for example, when the defendant has successfully completed probation.' ([*People v.*] *Park* [(2013)] 56 Cal.4th [782,] 793; see § 17(b)(3).)" (*People v. Tran* (2015) 242 Cal.App.4th 877, 885 (*Tran*).)

"Section 17(b) allows the trial court to determine the nature of such an offense at the time of sentencing or later, namely 'on application of the defendant or probation officer' after the trial court has granted probation 'without imposition of sentence.' (§ 17(b)(3)." (*Tran, supra,* 242 Cal.App.4th at p. 887.)  A trial court has broad discretion in deciding whether to reduce a wobbler to a misdemeanor.  (*Ibid.*; *People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977 (*Alvarez*).)  "The relevant criteria in exercising that discretion include ' "the nature and circumstances of the offense, the defendant's appreciation of and attitude toward the offense, or his traits of character as evidenced by his behavior and demeanor at the trial." ' (*People v. Bonilla* (2018) 29 Cal.App.5th 649, 661, quoting *Alvarez, . . .* at p. 978.)

" 'We will not disturb the court's decision on appeal unless the party attacking the decision clearly shows the decision was irrational or arbitrary. (*Ibid.*)  Absent such a showing, we presume the court acted to achieve legitimate sentencing objectives.  ([*Alvarez, supra*, 14 Cal.4th] at pp. 977–978.)' (*People v. Sy* (2014) 223 Cal.App.4th 44, 66.)" (*Tran, supra*, 242 Cal.App.4th at p 887.)

Araujo's motion under section 1203.4 sought dismissal of her convictions.  Section 1203.4 provides for three situations in which a defendant may be entitled to such relief.  "With exceptions not applicable here, they include when the defendant (1) 'has fulfilled the conditions of

6

probation for the entire period of probation,' (2) 'has been discharged prior to the termination of the period of probation,' or (3) 'in any other case in which a court, in its discretion and the interests of justice, determines that a defendant should be granted the relief available under' section 1203.4 . . . ." (*People v. Seymour* (2015) 239 Cal.App.4th 1418, 1429, quoting section 1203.4, subdivision (a).) If the defendant comes within either of the first two scenarios, dismissal is mandatory. (*Seymour*, at p. 1430; *People v. Holman* (2013) 214 Cal.App.4th 1438, 1459.) " 'Under the third scenario, the court exercises its discretion whether to grant relief in the interests of justice.' " (*Seymour*, at p. 1430, quoting *Holman*, at p. 1459.) "[I]n determining whether to grant relief under the discretionary provision, the trial court may consider any relevant information, including the defendant's postprobation conduct." (*People v. McLernon* (2009) 174 Cal.App.4th 569, 577.)

## I.

Araujo first contends the denial of her motions must be reversed and the matter remanded due to section 1465.9, which first became operative in 2021 and pursuant to which she contends her outstanding probation fees, victim restitution, and monthly supervised probation fees must be vacated. She also maintains the elimination of her obligation to pay fees requires reconsideration of her motions because they were denied in part due to her failure to pay the fees imposed when she was sentenced.

### *The Order to Pay Supervised Probation Fees Must be Vacated*

Section 1465.9, subdivision (a), provides that the "balance of any court-imposed costs" pursuant to specified statutes, "as those sections read on June 30, 2021, shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." Subdivision (b) of section

7

1465.9 provides that "[o]n or after January 1, 2022," the same relief applies to additional specified statutes, as they read on December 31, 2021.[4]

Araujo's obligation to pay monthly probation supervision fees of not more than $75 was imposed pursuant to former section 1203.1b, which is one of the statutes listed in subdivision (a) of section 1465.9.[5] The parties agree that any unpaid amount Araujo was required to pay for probation supervision fees is now unenforceable and uncollectible, and any portion of the judgment imposing fees pursuant to former section 1203.1b must be vacated. (*People v. Clark* (2021) 67 Cal.App.5th 248, 259.)

Araujo further states that "outstanding probation costs (§ 1203.1(b))" and "any victim restitution (§ 1203.1(b))" must also be vacated. Section 1203.1, subdivision (b), authorizes a court granting probation to order the defendant to "make restitution to the victim or the Restitution Fund" as a condition of probation. When Araujo was sentenced in 2009, the court imposed a $200 restitution fine (§ 1202.4) and reserved jurisdiction over

---

[4] Section 1465.9 was originally enacted in 2020 and became operative on July 1, 2021. (Stats. 2020, ch. 92, § 69.) The currently operative version of section 1465.9 was adopted by an amendment, effective September 23, 2021, that added one statute not relevant to the present case to subdivision (a) and added the current provisions of subdivision (b). (Stats. 2021, ch. 257, § 35.)

The statutes listed in subdivision (a) of section 1465.9 are sections 987.4, 987.5, subdivision (a), 987.8, 1203, 1203.1e, 1203.016, 1203.018, 1203.1b, 1208.2, 1210.15, 1463.07, 3010.8, 4024.2, and 6266.

The statutes listed in subdivision (b) of section 1465.9 are sections 1001.15, 1001.90, 1202.4, 1203.1, 1203.1ab, 1203.1c, 1203.1m, 1203.4a, 1203.9, 1205, 1214.5, 2085.5, 2085.6, and 2085.7.

[5] Section 1203.1b was repealed by the same legislation that originally enacted section 1465.9. (Stats. 2020, ch. 92, § 47.)

restitution.  The record on appeal does not indicate whether a restitution order was ever made.[6]

Regardless, section 1465.9 does not eliminate defendants' responsibility to pay restitution.  None of the statutes listed in subdivision (a) of section 1465.9 concern restitution orders.  Subdivision (b) of section 1465.9, which the parties do not address and which only became effective on January 1, 2022, does list statutes relevant to victim restitution, including sections 1202.4 and 1203.1.  But we understand these references to be to the provisions of these statutes concerning administrative costs associated with restitution orders, not restitution orders themselves.

Two points make this clear.  First, the legislative findings and declarations in connection with the 2021 amendment of section 1465.9 make clear that its purpose is elimination of "criminal *administrative fees*."  (Stats. 2021, ch. 257, § 1, subds. (h)–(l), italics added.)  Section 2 of Assembly Bill No. 177 by which this amendment was enacted states, "It is the intent of the Legislature to eliminate the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system and to eliminate all outstanding debt incurred as a result of the imposition of administrative fees."  Second, the same legislation that amended section 1465.9 to include the present subdivision (b) also repealed various statutory provisions authorizing administrative fees, including the subdivisions of section 1202.4 and 1203.1 that previously allowed for imposition of

---

[6] Araujo does not explain what other probation costs she believes to be at issue.  She cites only section 1203.1, subdivision (b), which addresses only restitution.  The other fees imposed at her sentencing were the $30 criminal conviction assessment pursuant to Government Code section 70373 and $20 court security surcharge pursuant to section 1465.8.  Neither of these statutes are listed in section 1465.9.

administrative fees to cover the cost of collecting restitution fines (former § 1202.4, subd. (l)) and victim restitution (§ 1203.1, subd. (l).) (Stats. 2021, ch. 257, §§ 19, 20, 21, 22.)

Accordingly, we find no merit in Araujo's suggestion that section 1465.9 entitles her to vacation of "any victim restitution" she was ordered to pay. The portion of the judgment imposing probation supervision fees pursuant to former section 1203.1b, however, must be vacated.

### *Section 1465.9 Does not Require Reconsideration of the Motions*

Araujo's argument that section 1465.9 requires remand and reconsideration of her motions is based on the trial court having denied relief in part due to her failure to pay fines and fees which are now "largely or wholly vacated." Additionally, Araujo argues the trial court was "materially mistaken" when it stated that she was saying she wanted a better job, but not doing anything to find one. Araujo points to her attorney's statements, in his declaration in support of her motions and at the hearing, that she was not paid for her work at the family restaurant, had worked for Google Shopping Express, and was currently driving for Uber, Lyft, and Door Dash. She also emphasizes that the hearing occurred in December 2020, amid the COVID-19 pandemic when many people were not working at all.

The record does not provide much information regarding the total of Araujo's financial obligation for fees affected by section 1465.9. The prosecution's opposition stated she owed an outstanding balance of $2,588 in fines and fees without explaining how that amount was derived. Although the record does not reveal what probation supervision fees were actually imposed or whether Araujo made any payments, it is fair to assume the bulk of her obligation was due to the probation supervision fees, as the other fines

and fees imposed at sentencing totaled only $250.[7]  As we have stated, Araujo is not responsible for any outstanding balance on the probation supervision fees and the order imposing those fees must be vacated.  Thus, Araujo is correct that the fees the trial court held her responsible for failing to pay have been largely vacated.

We do not agree, however, that this means the denial of her motions to reduce and dismiss her convictions must be reconsidered.  Although the court relied in part on the failure to make the required payments, the record demonstrates the trial court's main focus was on the nature of Araujo's offenses and her attitude toward the legal consequences of her conduct.

At the hearing, defense counsel told the court that at the time of trial Araujo had recently been put on psychiatric medication and had "a lot of anger issues" and a "horrible, horrible living situation."  Since then, she was in better shape, taking her medication and working as stated above.  Counsel stated Araujo had not had the funds to pay the court-imposed fees, but he "believe[d] she made some effort to pay something."  Counsel's declaration in support of the motions noted that she had completed her probation even though she did not meet her financial obligations, and that on the occasions he had seen Araujo since her convictions, she had been respectful and talked about how her felony convictions prevented her from obtaining better employment.

With respect to the offenses, counsel related Araujo's comments that she "had been a victim of racism all of her life" and the words she used "came out of anger."  Counsel argued Araujo "was not using the pejorative term as it

---

[7] Araujo calculates that if the maximum $75 monthly probation supervision fee was imposed for the full three years of her probation, her total would have been $2700.

11

was, but more as the way rap singers use that and just as a form of address as nigga, n-i-g-g-a" and that she was "just out of control, angry on that day, based on what happened." Counsel also stated that Araujo had not sustained any further convictions, thereby demonstrating she had "taken her responsibility as a citizen more respectfully."

The prosecutor did not focus on the financial issues but rather emphasized the nature of the offenses and argued they were not aberrant and Araujo had never shown remorse. The written opposition briefly related two incidents in which Araujo used racial epithets against individuals she encountered at the College of San Mateo (CSM): On January 29, 2008, she became irate at an African-American security guard who asked her to use the proper stairwell and called him a "stupid fucking nigger," and on February 5, 2008, without provocation, she called an African-American student "Fucking monkey, jiggaboo and nigger." The prosecutor noted that Araujo violated probation less than four months after it began by attempting to prevent officers from conducting a probation search and again being verbally abusive toward them, and related the probation officer's statement, a few weeks after the probation violation, that Araujo "does not acknowledge that anything is wrong with her behavior and on one occasion she stated that she only tells this officer what she thinks she wants this officer to hear." The prosecutor described Araujo's racial slurs and false claims of sexual assault as "some of the most vile facts . . . this author has had to put into print," argued Araujo had expressed no "remorse, self-reflection, or personal growth," and urged that granting the motion would be the "antithesis of justice." At the hearing, the prosecutor argued that Araujo used "some of the most disgusting language" and was "completely insincere and disingenuous, not accepting

12

responsibility even five years later," and that there was "absolutely no indication that she is remorseful for her behavior at all."

The court certainly relied in part upon Araujo's failure to pay her fines and fees in denying the motions to reduce and dismiss the convictions, but its remarks indicate it was primarily moved by its perception of Araujo's words and conduct, and saw her failure to pay the court-imposed fees as demonstrating an absence of motivation or conviction to change. The court described the underlying crime as "beyond disgusting," with "vile and disgusting language" used against "law enforcement officers of color," and, referring to the CSM incidents, stated, "this isn't a one-off." After expressing disapproval of Araujo's life being characterized as "so hard" when "there are so many other people in this world that have not even a roof over their head that [Araujo] has been afforded," the court stated, "I am appalled at the behavior. But not only that, she didn't complete probation successfully because she got a probation violation and never paid the fines and fees. So the fact that . . . she's walking around San Bruno and South City saying, I want a better job. Well, go out and find one. I don't see anything in this paperwork that shows that she has applied for any job and was denied or that she's gone back to any sort of school to better herself. [¶] There's nothing in here that shows that she warrants this to become a misdemeanor and dismissed." The court made a point of stating for the record, "I don't think she should ever have a reduction of this case, ever. Her conduct was that disgusting, and her performance on probation was not warranting at all of a reduction and dismissal, given that she didn't successfully complete probation. She had a probation violation."

Section 1465.9 did not become operative until seven months after the hearing on Araujo's motions. Even if we assume, with Araujo, that section

13

1465.9 retroactively invalidated any reliance upon her failure to pay the probation supervision fees we have concluded must be vacated, she has not demonstrated a remand is required on this basis. Given the trial court's view of Araujo's offenses, subsequent probation violation, and apparent failure to make any payment during the more than 10 years following her convictions and sentencing, there is no possibility the court would have reached a different conclusion if Araujo's outstanding financial obligation had consisted only of the $200 restitution fine and $50 in fees not affected by section 1465.9. Araujo's assertion that the court was "materially mistaken" when it stated that she was saying she wanted a better job, but not doing anything to find one is not particularly persuasive, as her emphasis on her current work as a driver and courage doing so during the pandemic take no account of some 10 years following her convictions. If the trial court's decision was otherwise a proper exercise of its discretion—a point to which we will return—section 1465.9 would not alter the result in the circumstances here.

## II.

Araujo contends she is entitled to a limited remand for the trial court to consider whether to grant her relief under section 1001.36, which she maintains applies retroactively to this appeal.

"Section 1001.36 authorizes a pretrial diversion program for defendants with qualifying mental disorders. The statute defines ' "pretrial diversion" ' as 'the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment . . . .' (§ 1001.36, subd. (c).) The stated purpose of the diversion statute 'is to promote all of the following: [¶] (a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and

14

reentry into the criminal justice system while protecting public safety. [¶] (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings. [¶] (c) Providing diversion that meets the unique mental health treatment and support needs of individuals with mental disorders.' (§ 1001.35, subds. (a)–(c).)" (*People v. Frahs* (2020) 9 Cal.5th 618, 626 (*Frahs*).)

Section 1001.36 enumerates six criteria for eligibility: (1) the defendant suffers from a qualifying mental disorder; (2) the disorder was a "significant factor" in the commission of the charged offense; (3) the defendant's symptoms will respond to mental health treatment; (4) the defendant consents to diversion and waives his or her speedy trial right; (5) the defendant agrees to comply with treatment; and (6) the defendant will not pose an unreasonable risk of danger to public safety if treated in the community.[8] " 'If the defendant has performed satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion' and 'the arrest upon which the diversion was based shall be deemed never to have occurred.' (*Id.*, subd. (e).)" (*Frahs*, *supra*, 9 Cal.5th at p. 627.)

*Frahs* held that section 1001.36 applies retroactively to all cases not yet final on appeal. (*Frahs*, *supra*, at pp. 624–625, 640.) This holding is an application of the rule that "an amendatory statute lessening punishment for a crime [is] presumptively retroactive and applie[s] to all persons whose

---

[8] Defendants convicted of certain offenses, such as murder and various sexual offenses, are not eligible for diversion under section 1001.36. (§ 1001.36, subd. (b)(2).)

judgments [are] not yet final at the time the statute took effect." (*Id.* at p. 624; *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).) Consistent with prior cases applying the *Estrada* rule to "statutes that merely made a reduced punishment *possible*," *Frahs* held "the ameliorative nature of the diversion program places it squarely within the spirit of the *Estrada* rule" and found no clear indication of Legislative intent to overcome the *Estrada* inference of retroactivity. (*Frahs*, at p. 631.)

*Frahs* involved a defendant whose appeal from a judgment of conviction was pending at the time section 1001.36 was enacted. Here, Araujo seeks to apply section 1001.36 to convictions she sustained over a decade ago. " '[F]or the purpose of determining retroactive application of an amendment to a criminal statute, a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed. (*In re Pedro T.* (1994) 8 Cal.4th 1041, 1046, citing *In re Pine* (1977) 66 Cal.App.3d 593, 594; see also *Bell v. Maryland* (1964) 378 U.S. 226, 230 ["The rule applies to any such [criminal] proceeding which, at the time of the supervening legislation, has not yet reached final disposition in the highest court authorized to review it"].)' " (*People v. Vieira* (2005) 35 Cal.4th 264, 306, quoting *People v. Nasalga* (1996) 12 Cal.4th 784, 789, fn. 5.) Araujo's convictions are long since final.

Attempting to refute the Attorney General's argument that section 1001.36 does not apply to judgments that were final at the time it was enacted, Araujo asserts the Attorney General ignores *People v. Braden* (2021) 63 Cal.App.5th 330 (*Braden*), review granted July 14, 2021, S268925, which is currently pending before the California Supreme Court. The Supreme Court granted review to consider the question, "What is the latest point at which defendant may request mental health diversion under Penal Code

16

section 1001.36." Araujo contends relief is available "in conjunction with a section 1203.4 motion and an appeal thereof."

*Braden* is inapplicable. The case presented no issue of retroactive application of a statute; that issue was resolved in *Frahs*. The question presented in *Braden* is how late in the process section 1001.36 relief may be sought by a defendant being prosecuted *after* the statute became effective. The Court of Appeal in *Braden* held the defendant, who requested diversion after being convicted, but before sentencing, was ineligible for relief because his request was not made before trial began. (*Braden, supra,* 63 Cal.App.5th at p. 332.) The *Braden* court disagreed with *People v. Curry* (2021) 62 Cal.App.5th 314, 321, review granted July 14, 2021, S267394, which held a request for section 1001.36 could be made until entry of judgment.

Araujo suggests no authority for her contention that a criminal statute can be applied retroactively to a criminal judgment that became final many years before the statute's enactment. In fact, such application would exceed constitutional bounds, as the *Estrada* court stated in explaining the rule it established: " 'When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage *provided the judgment convicting the defendant of the act is not final.*' " (*Frahs, supra*, 9 Cal.5th at pp. 627–628, quoting *Estrada, supra,* 63 Cal.2d at p. 745, italics added.)

17

As the above quoted passage makes clear, the *Estrada* rule does not apply to final judgments of conviction.

## III.

Araujo raises several somewhat inter-related challenges based on what she sees as an improper focus by the prosecutor and the trial court on the language she used in the commission of the offenses and the inferences of racial bias drawn from that language. Emphasizing that the jury found the hate crime allegation not true, and the sentencing judge indicated the "racially tinged" language resulted from Araujo's inability to control her thoughts and speech rather than racial motivation, Araujo argues the prosecutor improperly portrayed her as a racist and falsely argued there was no indication she was remorseful, the trial court's reliance upon her "disgusting" language ignored the protections afforded such speech under the First Amendment, and the trial court disregarded circumstances the sentencing judge viewed as mitigating.

The Attorney General correctly points out that Araujo did not raise these issues below, thereby forfeiting them for appeal. We exercise our discretion to consider them both to forestall a potential claim of ineffective assistance of counsel (*People v. Williams* (2009) 170 Cal.App.4th 587, 621) and because some of Araujo's claims implicate the overall fairness of the proceeding (*People v. Anderson* (2020) 9 Cal.5th 946, 963).

### *First Amendment Protection for Offensive Speech Directed at the Police*

Araujo contends the trial court abused its discretion by denying her motions due to the "disgusting language" she used in the commission of her offenses, thereby improperly punishing her for speech that is protected by the First Amendment to the United States Constitution. She correctly points out that the caselaw is extremely protective of the right to free expression, even

18

when the speech at issue is highly offensive to others and particularly when it is directed at police officers. " '[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.' (*Houston v. Hill* (1987) 482 U.S. 451, 461.) Indeed, '[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.' (*Id.* at pp. 462–463.) While the police may resent having abusive language 'directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment.' (*Duran v. City of Douglas* (9th Cir. 1990) 904 F.2d 1372, 1378.)" (*People v. Quiroga* (1993) 16 Cal.App.4th 961, 966.) "[E]ven crude speech may be entitled to constitutional protection . . . and the weight of that constitutional protection is heavier after a police intrusion." (*State v. W.* (Me. 1980) 418 A.2d 1097, 1108.)

The many cases Araujo discusses similarly emphasize the constitutional protection afforded even offensive and abusive speech, as long as it falls short of "fighting words that ' "by their very utterance inflict injury or tend to incite an immediate breach of the peace." ' " (*Houston v. Hill*, *supra*, 482 U.S. at pp. 461–462, quoting *Lewis v. New Orleans* (1974) 415 U.S. 130, 133 (*Lewis*).) And the Supreme Court has recognized that "even the 'fighting words' exception . . . might require a narrower application in cases involving words addressed to a police officer, because 'a properly trained officer may reasonably be expected to "exercise a higher degree of restraint" than the average citizen, and thus be less likely to respond belligerently to "fighting words." ' " (*Houston*, at p. 462, quoting *Lewis,* at p. 135, conc. opn. of Powell, J.) "The Supreme Court has consistently held that the First Amendment protects verbal criticism, challenges, and profanity directed at

19

police officers unless the speech is 'shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.' " (*United States v. Poocha* (9th Cir. 2001) 259 F.3d 1077, 1080 (*Poocha*), quoting *Houston*, at p. 461.)[9]

---

[9] In *Lewis,* for example, the defendant yelled obscenities and threats at a police officer who stopped the vehicle her husband was driving and asked for his license. She was convicted of violating an ordinance the Supreme Court found constitutionally overbroad because it could be applied to "speech, although vulgar or offensive, that is protected by the First and Fourteenth Amendments." (*Lewis*, *supra*, 415 U.S. at pp. 131, 134, fn. 4.)

*Duran v. City of Douglas, supra,* 904 F.2d at page 1378, held the First Amendment protected obscene gestures and profanities yelled at a police officer: "Inarticulate and crude as Duran's conduct may have been, it represented an expression of disapproval toward a police officer with whom he had just had a run in" and "[a]s such, it fell squarely within the protective umbrella of the First Amendment . . . ." (*Ibid.*)

The defendant in *Poocha*, while aggressively clenching his fists and sticking out his chest, yelled, " 'fuck you' " or " 'that's fucked' " at park ranger who was trying to disperse a crowd. His statement was a constitutionally protected "expression of criticism of the police," neither fighting words— because it was not likely to provoke a violent response from the officer—nor incitement to riot. (*Poocha*, *supra*, 259 F.3d at p. 1082; see also, *Marttila v. City of Lynchburg* (Va.App. 2000) 535 S.E.2d 693, 698 [calling officers " 'fucking pigs' and 'fucking jokes' and [saying] they 'should be at a fucking donut shop' " was expression of "contempt, lacking direct tendency to cause immediate violent reaction from reasonable person in officer's position]; *State v. W.*[, *supra*,] 418 A.2d 1097 [" 'Hey, turn around and come back here,' " " 'Hey, you fucking pig, you fuckin' kangaroo' " and " 'Fuck you' " yelled at police officer during traffic stop not fighting words even if they might be if directed against another person]; *L.A.T. v. State* (Fla.App. 1995) 650 So.2d 214, 215–218 [juvenile screaming that arrest of companion was police brutality, cursing at "[y]ou fucking cops," and continuing to scream obscenities and wave arms when directed by police to calm down did not utter fighting words, just "loudly and profanely protested what he thought was the abusive conduct of the police"].)

20

The cases Araujo discusses differ from hers in that they involve punishment for speech alone. Araujo concedes that her conduct in 2008—including struggling, spitting, and hitting officers—was not solely verbal and her physical conduct was not protected by the First Amendment. Araujo was also threatening violence: As described in our 2010 opinion, she "yelled 'die you fucking pig, 187 on a cop' while yelling other obscenities and racial slurs, physically resisting the officers, including spitting on them, stomping on their feet, and reaching for one of their weapons, and while attempting to get past the officers toward the back of the house where the officers knew a loaded gun had been found." In that appeal from Araujo's convictions, considering Araujo's physical conduct, the fact that the jury instructions required a threat of violence and intent to deter the officers,[10] and the prosecutor's argument that the evidence showed a combination of verbal threats and violence, we rejected Araujo's argument that her threat was constitutionally protected hyperbole, "an 'extreme method of expressing her anger' at the police intrusion into her home."

Here, however, Araujo argues that the prosecutor and court relied solely on her offensive, racially charged words in their portrayal of the seriousness of her offenses, and the consequent denial of her motions resulted in punishment in violation of the First Amendment.

The record supports Araujo's characterization of the prosecutor's and court's focus. The prosecutor's written opposition argued, "considering that

---

[10] To convict Araujo of violating section 69, the jury had to find that she attempted to deter an executive officer from performing his or her lawful duty by use of violence or a threat of violence a reasonable listener would interpret as a serious expression of intent to commit an act of unlawful force or violence, with intent to deter the officer; or that she unlawfully used force or violence to resist an executive officer performing his or her lawful duty. (§ 69, CALCRIM Nos. 2651 & 2652.)

the victim suffered no physical injuries and no one was actually sexually assaulted or harmed, these are some of the most vile facts . . . this author has had to put into print. The defendant is obviously the type of person who thinks she can use hundreds, if not thousands, of years of people's collective pain and trauma to her advantage in situations where she is quite obviously in the wrong. She repeatedly and intentionally directed the most abhorrent, racially charged word of our time at black police officer, while perpetrating violence and quite literally spitting on that same police officer, as well as others. This was an escalation from her prior conduct of pointing out African-American college students and staff and screaming racial epithets at them in public.

"But the defendant wasn't done. She then accused that same black officer and other officers, of rape. There was no misunderstanding of the situation here; this was entirely fabricated, and she knew it. She devalued the experience, pain, and trauma of real sexual assault and rape victims by claiming the officers sexually assaulted and raped her to attempt to gain some advantage in the situation. Furthermore, she falsely accused a black man of rape and sexual assault, a practice with a grim history in this nation. No doubt she was trying to scare and intimidate the officers into releasing her and letting her and her brother go about their felonious business.

"Finally, she attempted to insinuate that her probation officer was assaulted by an ex-boyfriend causing facial scar. She attempted to tap into some trauma that may or may not be there, to hurt her probation officer.

"There is enough evidence presented in the police reports and the probation reports to demonstrate that the incident that led to these convictions was not an aberration. On the contrary, it was indicative of who the defendant is as a person. [¶] . . . [¶] . . . . The passage of time and not

22

being caught for criminal or racist actions recently does not mean the defendant has reformed and it does not mean she does not still harbor the vile hatred and racism in her heart."

To be sure, the prosecutor described the physical struggle in the statement of facts at the beginning of the opposition and, as shown above, referred to it in one sentence of the argument. But the prosecutor's argument was focused on the egregious language Araujo used and racist motivation the prosecutor believed it reflected. At the hearing, the prosecutor did not refer to Araujo's physical conduct; her remarks solely addressed Araujo's words and lack of remorse. As to the former, the prosecutor urged: "[T]he facts of this crime cause a visceral reaction in anyone who hears them. It is some of the most disgusting language . . . . She wasn't using it in a hard 'R' fashion. [¶] We are in a reckoning in this country when it comes to race and racism and how we treat that. We're in a time where we're considering—or actually tearing down statutes [*sic*] of people who have had . . . awful records of race from hundreds of years ago. [¶] The passage of time does not forgive or forget Araujo's actions in this case."

The trial court, too, focused on Araujo's words in referring to the offenses. The court's explanation of its ruling began, "The underlying crime is beyond disgusting. The vile and disgusting language that she used not only against law enforcement officers, but law enforcement officers of color, including African-American and of Asian [descent]. [¶] And this isn't a one-off. This is someone who went to CSM, College of San Mateo. And any African-American that she saw, she also had the same reaction and disgusting behavior towards." The court's comments, even more than the prosecutor's, indicate it was Araujo's speech above all else the court found disturbing, as the court referred to the CSM incidents—which involved

23

speech unaccompanied by any threat or violence—as involving "the same reaction and disgusting behavior toward" African-Americans as the offenses at issue. And the speech both the prosecutor and the court focused on was *not* the threat of violence but the racial epithets and insults Araujo yelled along with her more general tirade against the officers.

This focus is troubling. Araujo's racially charged language was deeply offensive. But this offensive language was not the basis of her criminal conduct except as it defined the circumstances in which the conduct underlying her conviction occurred. To the extent Araujo's convictions rested directly on speech, as opposed to physical conduct, the culpable speech was the threat conveyed by her statement, " 'die you fucking pig, 187 on a cop.' " The racially charged language alone could not have supported the convictions, yet this language appears to be what the trial court viewed as the crux of the offenses, and as earlier discussed, the denial of the motions appears to have been most strongly influenced by the court's view of the offenses as "disgusting" and "appall[ing]." The court's focus thus gives credence to Araujo's claim that in denying her motions, the trial court in effect punished her speech which has not been shown to be, in itself, outside constitutional protection.

The focus on Araujo's offensive language is concerning for additional reasons. One of these is the strong indication in the record that some form of mental illness, or at least psychological issues, could have played a role in Araujo's offenses. When Araujo was sentenced in 2009, the defense submitted a psychological evaluation to the court which described a traumatic childhood, a dysfunctional family with a strong history of mental illness and "running problems" with the police due to violence at the family home, and personal history including anger issues, drug use, and depression.

24

Araujo had begun a new antidepressant a few days before the February 2008 incident that led to the convictions. The psychologist saw the two incidents at CSM, which occurred only weeks before the offenses, as precursors indicative of Araujo's distress, with the events on the day of the offenses as the last straw. The psychologist described Araujo as reactive and volatile when she felt stressed and disrespected, reported that he did not find in her the pattern most associated with hate crimes, and noted he could not rule out an underlying severe mental disorder.

The sentencing court saw Araujo as having "a problem controlling her immediate thoughts. Many of her thoughts, when she's angry or feels under attack, are tinged with racially inappropriate epithets. But she also says all sorts of other very nasty things to other people that are not necessarily racially motivated." The court noted that Araujo made comments to the judge and other personnel that were "not racially motivated, but she just says whatever comes to her mind. There is absolutely no filter with Araujo." The court stated, "I do see that those racially tinged epithets in that . . . perspective. That she just appears to not be able to control her thoughts and says them out loud."[11]

Additionally, it is noteworthy that the two incidents at CSM, the offenses for which Araujo was convicted, and her subsequent probation violation in May 2008 all occurred within a span of less than four months. The record reflects no offenses since, perhaps consistent with the

---

[11] Araujo told the court she did not say what she said out of "racial hate," but "to make them feel the way I felt at the moment"; asked if she understood the words "are inappropriate and you should not be using them," Araujo replied, "[d]efinitely" and acknowledged her "mouth [being] too much, you know, for me to control at times," but said she did not feel she was a "violent person."

psychologist's suggestion that Araujo was in a particularly extreme state of distress at that time.[12]  The trial court in the present case gave no indication of having considered the potential role of psychological issues in the offenses or, for that matter, in the failure to find better employment for which the court faulted Araujo.  To the contrary, the court's remarks indicate it viewed Araujo as intentionally acting in an unmitigatedly racist manner in the offenses and in an irresponsible and unrepentant manner since.[13]

Araujo's argument that the prosecutor falsely portrayed her as a racist is also relevant here.  Araujo argues the prosecutor's portrayal contradicted—or, as she puts it, constituted an impermissible collateral attack on—the jury's rejection of the hate crime allegation and the sentencing judge's finding that Araujo's statements were not racially motivated.  She maintains the trial court based its denial of her motions on this improper view of her as racist.

---

[12] Araujo had prior convictions for assault with a weapon not a firearm (§ 245, subd. (a)(10)), committed in 2004, and for battery (§ 242), committed in 2006.

[13] Araujo complains that the trial court failed to consider the mitigating circumstance that she honestly but unreasonably believed the search of her home that triggered her offenses was unlawful because the officers did not have a warrant.  Araujo reasons that if an honest, unreasonable belief in the need for self-defense negates malice and reduces second degree murder to voluntary manslaughter (*People v. Flannel* (1979) 25 Cal.3d 668, 674–680), her honest, unreasonable belief that the search was unlawful "was mitigating when no officer was killed, seriously injured, or injured at all."  The analogy is not helpful.  Reducing murder to manslaughter under the doctrine of unreasonable self-defense is not a mitigation of punishment, it is a recognition that the specific mental state required for murder is not present. This is far different from dismissing all culpability for felony conduct in the interests of justice.

Araujo's characterization of the prosecutor's arguments as a collateral attack on prior determinations is misplaced.[14]  It is not accurate to say, as Araujo does, that the jury "authoritatively concluded that the offenses were *not* even *partially* motivated and committed because Araujo was racially biased."  In finding the hate crime allegation not true, the jury found the prosecutor had not proven beyond a reasonable doubt that Araujo's offenses were motivated at least in part by racial bias.  It did not affirmatively

---

[14] *People v. Butler* (1980) 105 Cal.App.3d 585, 589 (*Butler*), the authority Araujo cites in connection with this argument, presented a very different situation.  Near the end of Butler's original probation period, the period was extended for six months with a condition that Butler be medically examined to confirm he had become totally disabled. (*Id.* at p. 587.)  Butler had paid only a portion of the restitution ordered when he was placed on probation. (*Ibid.*)  After receiving confirmation of his disability, the trial court terminated probation three months prior to the end of the extended period. (*Ibid.*)  Butler then sought relief under section 1203.4 on the grounds that he had been discharged from probation early. (*Butler*, at p. 587.)  Rejecting the Attorney General's argument that the original probation period did not end early and the petitioner should not get the benefit of an extension necessitated by his own failure to comply with probation conditions, *Butler* stated that section 1203.4 rewards those who are relieved from complying with terms of probation, as well as those who comply, and the court that terminated probation early found good cause for doing so. (*Butler*, at pp. 588–589.)  *Butler* explained, "This decision is final.  The People cannot now, in effect, collaterally attack the propriety of the judge's decision to terminate early.  Once probation is terminated early, a later judge who is requested to grant relief under section 1203.4 is without discretion to deny relief." (*Id.* at p. 589.)

*Butler's* holding that a trial court's decision to terminate probation early cannot be, in effect, collaterally attacked when the former probationer seeks relief under 1203.4 says nothing about the situation here, where the court entertaining the section 1203.4 motion is called upon to exercise its discretion as to whether relief is warranted based on all relevant circumstances and the interests of justice.

27

establish there was no such motivation.[15]  And the jury did not hear evidence of the two incidents at CSM in which Araujo used racial epithets against African-American individuals.

Nor is it clear the sentencing court made an actual finding that Araujo's language during the offenses was not racially motivated, as Araujo claims.  The sentencing court's recognition that Araujo said "very nasty" things that were "not necessarily racially motivated" does not demonstrate the court believed *none* of Araujo's thoughts and statements were racially motivated, much less made a binding factual determination on that point.[16]

---

[15] At trial, the jury was instructed pursuant to CALCRIM No. 1354 that the prosecution had the burden of proving the hate crime allegation beyond a reasonable doubt and, to do so, had to prove Araujo committed the crime "in whole or in part because of the alleged victim's actual or perceived race or ethnicity."  The instruction explained that this required the prosecution to prove beyond a reasonable doubt that Araujo was "biased against the victim based on the victim's actual or perceived race or ethnicity," that "the bias motivation caused [her] to commit the alleged acts," and that if Araujo had more than one reason to commit the alleged acts, the required bias "must have been a substantial motivating factor," meaning "more than a trivial or remote factor."

[16] Araujo's statement that the sentencing court found her "comments were 'not racially motivated but she just says whatever comes to her mind'" shades the meaning of the court's words by removing them from their context.  As earlier described, after noting that many of Araujo's thoughts were "tinged with racially inappropriate epithets," but she also said "very nasty" things that were "not necessarily racially motivated," the court continued, "She's come into this court and made comments about this judge, although that's not something that the court is going to weigh in favor or against her.  She's made comments to other court personnel in other courtrooms.  They are not racially motivated, but she just says whatever comes to her mind."  In context, it is clear that in the remarks Araujo quotes, the comments the court referred to as "not racially motivated" were not those made during commission of the offenses.

Nevertheless, the prosecutor's focus on Araujo's racial language and explicit and implicit depiction of her as unequivocally racist was plainly at odds with the jury's and sentencing court's more nuanced conclusions at trial. Given the extremity of Araujo's racial language, it would appear the jury's not true finding means at least some jurors were swayed—at least to the point of finding a reasonable doubt—by Araujo's defense that her conduct was not due to bias but an expression of anger and attempt to protect herself from what she believed was excessive use of force by the police. And, as the remarks quoted above demonstrate, the sentencing court saw Araujo's use of "racially tinged" language through the perspective of her inability to control her thoughts and speech: Racial epithets were one example of many offensive things, not necessarily racially motivated, that Araujo said when she was angry or felt attacked.

In short, the prosecutor's argument made Araujo's use of offensive, racially charged language, and inferences of racial bias drawn from it, the centerpiece of her offenses and reason for denying her current motions, when this language, in and of itself, was not the actual basis of her convictions and could not, consistent with the First Amendment, be the basis of punishment. The court's remarks about the offenses, similarly, indicate a singular focus on Araujo's racially charged language, without consideration of the potentially mitigating circumstances and explanations indicated in the record or the absence of evidence of criminal conduct in the decade since the convictions. The result is an appearance that Araujo's motions were denied largely because of the court's view of her speech as racist.

This appearance is bolstered by the court's statement, in announcing its ruling, "I can't think of someone who deserves a motion to reduce and dismiss less than Araujo." The statement is obviously hyperbole: Araujo's

egregious use of racial epithets notwithstanding, violations of section 69 involving no weapon and no resulting physical injury are not the most serious offenses a person can commit, and many defendants fail to remain free of further criminal sanction for 10 years.[17]  In light of the court's further remarks— that the underlying crime was "beyond disgusting," Araujo used "vile and disgusting language" against law enforcement officers of color, and this was consistent with her conduct toward African-Americans she encountered at CSM—it is difficult to escape the conclusion that the trial court's abhorrence for Araujo's offenses was due primarily to the language Araujo used and inference of racial animosity the court drew from it.

This conclusion is also supported by the court's exaggeration of the evidence of prior incidents involving what appeared to be racist speech. Referring to the evidence of the incidents at CSM as demonstrating the February 2008 incident from which the convictions arose was not a "one-off," the court said, "any African-American that [Araujo] saw" at CSM "she had the same reaction and disgusting behavior towards."  By broadly generalizing evidence showing incidents with two African-American individuals at CSM shortly before the February offenses to "any African-American" Araujo saw, the court expressed a view that Araujo's use of offensive racial language was part of her character.  Indeed, the court's vehemence was such that it twice stated its view that Araujo should *never* be granted relief under sections 17, subdivision (b), or 1203.4.  This prejudgment of any future showing Araujo

---

[17] Araujo inappropriately characterizes the court's comment as a "finding" that is not supported by substantial evidence because the offenses were "categorically not violent and not serious" as defined in sections 667.5, subdivision (c), and 1192.7, subdivision (c).  The comment cannot reasonably be taken as indicating the court believed the offenses were more serious, or Araujo more culpable, than any imaginable defendant convicted of any imaginable crime and was making a factual finding to that effect.

might be able to make, without regard to potential changes of circumstances, indicated a lack of impartiality and was clearly improper.[18]

To be clear, we are not saying the court was required to ignore Araujo's language, which was extraordinarily offensive and surely contributed to the tension and volatility of the situation. Araujo offers no persuasive support for her view that the prosecutor and court, in considering motions to reduce the convictions to misdemeanors and to dismiss them altogether, were required to accept as unassailable fact that Araujo's offenses were not motivated even in part by racial bias. Nor does she offer authority for her view that the court entertaining her section 1203.4 motion was precluded from considering the relevance of racially charged language used in the commission of the underlying offenses.

We are also not saying the trial court necessarily should have granted Araujo's motions. Araujo's offenses were very serious and her performance on probation not exemplary, at least at the beginning. Putting aside her failure to pay probation supervision fees, which were not a condition of probation, it appears she did not pay the restitution fine and fees not affected by section 1465.9, and she violated probation by again attempting to interfere with a probation search.

---

[18] Araujo challenges these remarks by arguing that the doctrine of res judicata does not bar a subsequent motion for relief under section 1203.4 after such a motion has been denied. Araujo is correct, as the Attorney General agrees, that "the denial of a prior request for relief under section 1203.4 does not preclude a subsequent request based upon different facts." (*People v. McLernon*, *supra*, 174 Cal.App.4th at p 577.) "A request for relief under the interests of justice provision of section 1203.4 necessarily will be based upon the facts as they exist at the time of the request. Those facts may be very different at different times." (*Ibid.*)

Significantly, the prosecutor also emphasized in opposing Araujo's motions that there was no indication she was remorseful for her conduct.[19] Araujo maintains this assertion was false, and the prosecutor "struck a foul blow" by making it, because the judge who sentenced her in 2010 found she was remorseful. But the sentencing court's finding was not binding for all time. The prosecutor's argument was that Araujo's motions, almost a decade after the convictions, did not present any statement from Araujo herself expressing remorse for these offenses, and Araujo has pointed to nothing contradicting the prosecutor's point.[20]

_____

[19] In her opposition to Araujo's motions, the prosecutor wrote: "What is perhaps most stunning about this request for expungement and reduction of the charges is that, despite this being the third request, the People were unable to find any statements from the defendant at all. This means this motion is entirely devoid of the defendant expressing any remorse, self-reflection, or personal growth. Thus, the defendant has failed to demonstrate that granting this motion would somehow serve the interests of justice. Even if the defendant decides to express some apology or statement of reform at the hearing, or in subsequent filings for the same motion in the future, the court should have serious doubts about the veracity of such statement. Just as she admitted once to her probation officer, she may simply tell the court what she thinks they want to hear."

At the hearing, the prosecutor argued, "The passage of time does not forgive or forget Araujo's actions in this case. There's absolutely no indication that she is remorseful for her behavior at all. And I frankly find it disgusting the behavior and that there has been no sincere remorse in even the ten years that it's been since this offense."

[20] In addition to the sentencing court's finding of no remorse upon which she primarily relies, Araujo suggests indications of her remorse may be found in her written statement to the probation officer prior to sentencing, which she describes as stating she "honestly thought no one was on probation," "was wrong," and "was sorry for her poor decision and her conduct," and to the psychologist's report submitted at sentencing, which she describes as saying her "acceptance of responsibility, embarrassment, and deep shame were continuous." The statement given to the probation officer reads more as a minimization of the offenses than an expression of remorse:

32

The trial court was required, however, to impartially exercise its discretion in light of all the relevant circumstances bearing on Araujo's motions. A court abuses its discretion if its decision is based on impermissible factors or an incorrect legal standard. (*People v. Knoller* (2007) 41 Cal.4th 139, 156.) As earlier noted, circumstances relevant to motions to reduce and dismiss convictions may include the nature and circumstances of the offense, the defendant's attitude toward the offense and character traits evidenced by his or her behavior and demeanor, the defendant's performance on probation, and the defendant's postprobation conduct. Here, the court's consideration of the motions appears to have been overwhelmingly influenced by its view of the language Araujo used during the offenses and in two incidents a few weeks prior to the offenses, and inferences drawn from that use of language about Araujo's character 10 years later.

We cannot conclude the trial court exercised its discretion impartially and with full consideration of the relevant circumstances. We therefore reverse the orders and remand for reconsideration of the motions. Because Judge Garratt's "comments give rise to a reasonable doubt about whether [she] can be impartial in this case," further proceedings shall be conducted by

---

"Got into trouble with police for yelling and swearing. Never laid finger on no one. I honestly thought no one was on probation, but I was wrong for both levels. I'm sorry for my poor decision to behave this way and conduct myself this way. I feel that I still have chance to redeem myself and rectify the past through better decisions in the future." "Yelling and swearing" hardly describes the vitriol and racial component of Araujo's offenses, and her portrayal of a solely verbal incident ignores her physical struggle with the officers, spitting and putting her hand on the holster of an officer's gun. The psychologist's report describes Araujo expressing acceptance of responsibility for her conduct. Its references to feelings of shame and embarrassment are not specifically tied to the offenses, as opposed to the various aspects of Araujo's personal history and family discussed in the report.

a different judicial officer. (*People v. Enriquez* (2008) 160 Cal.App.4th 230, 244 [disqualification mandated if reasonable person would entertain doubt concerning judge's impartiality]; § 1260 [appellate court may remand for "such further proceedings as may be just under the circumstances"].)

## DISPOSITION

The portion of the 2009 judgment imposing probation supervision fees pursuant to former section 1203.1b shall be vacated.

The order denying the section 17, subdivision (b), and section 1203.4 motions is reversed and the matter remanded for further proceedings, before a different judge, consistent with this opinion.

_____
Kline, J.*

We concur:


_____
Richman, Acting P.J.


_____
Stewart, J.


_People v. Araujo_ (A161761)


    * Assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.